687 So.2d 432 (1996)
Antoine M. SAACKS, Jr.
v.
CITY OF NEW ORLEANS, New Orleans Police Department, et al.
No. 95-CA-2074.
Court of Appeal of Louisiana, Fourth Circuit.
November 27, 1996.
Rehearing Denied February 27, 1997.
Opinion Amending Decision on Denial of Reconsideration March 24, 1997.
*435 Robert G. Harvey, Sr., Tamara Kluger Jacobson, Thomas Corrington, Robert G. Harvey & Associates, New Orleans, for Appellant.
Ike Spears, Sonja M. Spears, Kordice Douglas, Spears & Spears, New Orleans, for Appellee.
Before CIACCIO, ARMSTRONG and LANDRIEU, JJ.
CIACCIO, Judge.
This is an appeal from a ruling of the Civil Service Commission of the City of New Orleans upholding appellant's termination from the New Orleans Police Department.

FACTS AND BACKGROUND INFORMATION
Appellant, Antoine M. Saacks, Jr. ("Saacks"), was employed in various positions with the New Orleans Police Department ("NOPD") since he was initially hired as a police recruit in January of 1967. In 1969, Saacks attained permanent status in the civil service system and was promoted to the level of Detective. He was promoted to Sergeant in 1973, to Lieutenant in 1980 and to Captain in 1989. Also in 1989, Saacks was appointed by the City's Chief Administrative Officer to Assistant Superintendent or Deputy Chief of Police, an unclassified position in the city civil service system.
While serving on the police department, Saacks continued his education. In 1975, Saacks graduated from Tulane University with honors. He served in the Marine Corps from 1965 until his honorable discharge in 1972. During the course of his service with the police department, Saacks attended numerous seminars and courses to further his training, including the F.B.I. National Academy, the L.S.U. Law Enforcement Institute, and the University of Virginia School of Continuing Education in Criminal Justice Education. He also attended bomb investigation courses, burglary and robbery courses, and narcotics courses. Saacks also received numerous awards of merit from police organizations and many letters of commendation from the various Superintendents who served during Saacks' tenure with the police department. He also received letters of appreciation from several individuals in the community with whom he had come in contact during his career. Antoine Saacks was recommended to the Mayor by several community leaders and elected officials as an appointee to the Superintendent's position in *436 1991. However, Arnesta Taylor was appointed to Superintendent at this time, a position which he held until his retirement in 1993. Saacks retained his position as Assistant Superintendent or Deputy Chief.
In addition to his duties with the police department, Saacks was also involved in the coordination of private details. "Details" are private security jobs worked by off-duty New Orleans Police Department officers. The officers work outside of their regular hours with the police department, usually in their police uniforms, and are paid hourly by the private business or entity which hires them. Approximately 1200 officers, or eighty percent of the police force, work private details on a regular basis.
To some extent, details are handled directly through the Traffic Division of the police department. However, several ranking officers manage and coordinate details for themselves and for other officers on behalf of private businesses and public entities. In 1992, Saacks, along with Homicide Unit Commander, Lt. L.J. Canal, formed a private detail company called Police Security Detail, Inc. (hereinafter "PSD"). PSD "brokered" the details by arranging police officers to meet the security needs of private businesses, and charged a fee to the private entity for its services. PSD specialized in handling private details during movie and commercial productions in New Orleans. Although Saacks made initial contact with the production company officials and acted as the contact person, he did not actually provide security.
During the same time period, Saacks became interested in the gaming industry, and specifically video poker, as a possible career opportunity after he retired from the police department. In 1989, Saacks began discussions with individuals in the state of Mississippi who were operating cruise ships and were interested in replacing their gaming equipment. As a result of these discussions, Saacks met individuals with United Gaming, Inc. ("UGI"), a Nevada corporation which was interested in supplying equipment to gaming establishments in Mississippi in the event dockside gambling was legalized there. The Mississippi venture was not successful, but Saacks began to assist UGI in its efforts to participate in the developing gaming industry in Louisiana. During 1990-1991, Saacks participated in lobbying efforts in the Louisiana state legislature to legalize video poker. However, during the summer of 1992, after the passage of the video poker legislation in the state legislature, the Chief of Police, Arnesta Taylor, instituted a general order prohibiting members of the police department from working off-duty for video poker interests.
Prior to the institution of this order, Saacks, along with several partners, began negotiating with UGI for an ownership interest in what was planned to be one of UGI's subsidiaries in Louisiana, Video Services, Inc. During the course of these negotiations, UGI requested that Saacks obtain written permission from the Chief of Police to perform security consultation for the Louisiana business. In July of 1992, Chief Taylor signed an authorization form permitting Saacks to act as a security consultant and detail organizer for Video Services, Inc.
The negotiations between Saacks and UGI proved to be unsuccessful, however, and UGI decided not to pursue a business relationship with Antoine Saacks. Nevertheless, as a result of an oral contract between the parties, on August 20, 1993, UGI and Saacks confected a settlement agreement by which Saacks received the sum of $325,000.00 in exchange for a release of any and all claims against United Gaming or Video Services, Inc.

CHARGES AND DISCIPLINARY ACTION
In a letter dated November 19, 1993, the Metropolitan Crime Commission of New Orleans ("MCC"), a private organization, advised Superintendent of Police Joseph Orticke, Jr.[1] that evidence had been obtained from unnamed sources which indicated that Deputy Chief Antoine Saacks was engaged in "activities of a totally unethical nature and in *437 complete violation of New Orleans Police Department policies and code of conduct for its officers." Specifically, the MCC accused Chief Saacks of the following:
1) Personal, hands-on lobbying efforts in the Louisiana Legislature in behalf of video poker interests:
2) An attempt to involve himself in a business partnership in video poker enterprises in New Orleans;
3) A further effort to have himself engaged as a Security Director/Consultant for the same local video poker enterprises;
4) A close relationship with a proposed video poker business partner who was an associate of the late Carlos Marcello, has multiple felony convictions and whose association with organized crime figures has been documented;
5) Direct, personal effort to obtain for his business associates prime locations for video poker machines, and
6) Seeking clientele for, and business contracts favorable to, his Las Vegas gaming contacts and associates.
The complaint also cited as a violation of police department rules and regulations Saacks' receipt of $325,000.00 from UGI. As a result of these allegations, Saacks produced a document entitled "New Orleans Paid Detail/Outside Employment Authorization Form" which was dated July 30, 1992 and bore the of signature of former Superintendent Arnesta Taylor. Saacks maintained that this form was evidence that he had permission from the Chief of Police to engage in the activities complained of by the MCC. receipt of this authorization form, the MCC further alleged during a publicized news conference that the signature on the authorization form submitted by Saacks, which was purported to be the signature of Chief Taylor, was a forgery.
After receiving this complaint from the MCC as well as the information alleging the forgery, Chief Orticke referred the matter for investigation to Director Peter Munster of the Office of Municipal Investigations ("OMI"). By City ordinance, OMI has the responsibility and power to investigate and inquire into alleged misconduct of any City employee. Although the police department maintained its own investigative department known as the Internal Affairs Division ("IAD"), Chief Orticke believed that OMI was the proper entity to investigate a Deputy Chief of the police department. However, IAD was also involved in the investigation of Saacks and advised Chief Orticke of the development of the case.
By letter dated November 18, 1993, OMI also received a request to investigate the allegations raised by the MCC from Antoine Saacks, who had been informed that allegations were being made about his participation in gambling operations. Saacks requested that OMI "begin a comprehensive investigation of any criminal, ethical, or departmental wrongdoing" on his part. Saacks subsequently provided OMI with a copy of the outside employment authorization form which Saacks alleged had been signed by Chief Taylor. Saacks asserted this form evidenced the police department's knowledge of and compliance with his activities.
Following the receipt of these complaints, OMI Director Peter Munster began an investigation into the matter. Munster met with former Superintendent Taylor and showed him a copy of the Paid Detail/Outside Employment Form allegedly signed by him on July 30, 1992. This form purportedly gave Saacks authorization to become employed in the business Video Services, Inc. A signature appeared in the line marked "Superintendent." During the OMI investigation of the validity of the form, Chief Taylor stated that although the document appeared to contain his signature, he did not remember signing the form. He further stated he was unaware that the employment sought by Saacks was in the video poker industry, and had he known this information, he would not have signed the form based on the general order he had issued shortly before the date of the document. On July 17, 1992, a few weeks before this form was allegedly signed, General Order No. 387 was issued by the Office of Superintendent restricting members of the police department from employment in the video poker industry.
On the basis of Taylor's statement, Saacks was suspended from duty with the police *438 department effective November 23, 1993 by Chief Orticke for violations of General Order No. 387 and ASOP 85.0 relative to restrictions on outside employment and paid details. On November 24, 1993, Saacks held a news conference in which he denied any wrongdoing and maintained that Chief Taylor signed the authorization form giving him permission to participate in the video poker industry.
Also on November 24, 1993, OMI, under the supervision of the IAD, conducted an administrative search of Saacks' office in police headquarters for the purposes of investigating the allegations against Antoine Saacks. This search also included the office of L.J. Canal, Saacks' subordinate on the police department and co-owner of the private business, Police Security Details, Inc. During this search, OMI seized a box of documents from L.J. Canal's office which were photocopied by OMI and returned to one of the administrative assistants in the police department on the same day. OMI also copied cards from Saacks' telephone file and returned the cards to Saacks' office. Saacks was not present during this search.
Following this search, OMI continued its investigation of Saacks beyond the initial allegations of the MCC complaint with the documents obtained from the administrative search. In December of 1993, the FBI also began a criminal investigation into the MCC allegations of forgery, and OMI suspended its investigation during this time. Saacks appeared before a federal grand jury and submitted the original authorization form to them. In January 1994, the FBI returned the authorization form to OMI indicating that the they were unable to determine that the signature of Chief Taylor was a forgery. No criminal charges were brought against Saacks by the federal government.
On March 10, 1994, OMI's Investigative Report was completed by Senior Agent Robert Mehrtens and forwarded to Chief Orticke. On March 21, 1994, Saacks was tentatively reinstated to duty with the police department, demoted to the rank of Police Captain, and relieved of his unclassified position as Assistant Superintendent of Police.
By letter dated April 11, 1994 to Antoine Saacks from Chief Orticke by Henry Aschebrook of the IAD, Saacks was informed he was being charged with several violations of Departmental Rules and/or Procedures of the police department. These alleged violations went beyond the allegations contained in the MCC complaint, and included alleged improprieties relating to Saacks' detail company, Police Security Details, Inc. In fact, these alleged violations did not include a violation of General Order No. 387, which was the original basis for Saacks' suspension. However, the department reiterated its charge of a violation of ASOP 85.0 which was included in the grounds for Saacks' suspension.
Saacks was instructed to appear for a disciplinary hearing on April 18, 1994 to present any mitigating circumstances or explanations to these charges. An administrative hearing was held on April 18, 1994, and the charges against Saacks were read and discussed with him. Saacks denied the allegations at this time, and neither his attorneys nor the representative of the police association were permitted to speak on his behalf.
By letter dated April 19, 1994 from Chief Orticke, Saacks was advised that he was suspended for 119 days retroactive to November 23, 1995, the date of the suspension. Further, his continued employment with the New Orleans Police Department was terminated. The letter, which was prepared by Captain Henry Aschebrook of IAD, incorporated most of the charges compiled by OMI which were also sustained by Chief Orticke following the administrative hearing. Two of the charges asserted by OMI, unauthorized use of a movable and untruthfulness, were not sustained by Chief Orticke and do not form the basis of the disciplinary action imposed. The termination letter is attached hereto as Appendix "A," and contains the following violations:
1. Violation of Rule 2, Section 1 Adherence to Law: Failure to Obtain an Occupational License and Pay License Tax for Police Security Detail (Chapter 70 of the City Code) and Theft (LSA-R.S.14:67) for submission of fraudulent invoices.
2. Violation of Rule 4, Section 4Neglect of Duty: Failure to Supervise Lt. Canal in *439 his operation of Police Security Detail and failure to obtain Paid Detail/Outside Employment Forms for ownership of Police Security Detail and Jimmy C's, a part in the movie "JFK", and employment with UGI.
3. Violation of Rule 6, Section 3Public Statements and Appearances: Unauthorized statements to the press and media appearances.
4. Violation of Rule 7, Section 1Use of Department Property: Unauthorized use of police department telephones for private business use and unauthorized use of department property by Police Security Detail.
5. Violation of Rule 5, Section 2Associations: Association with convicted felon, Frank Caracci.

CIVIL SERVICE APPEAL AND DECISION
On May 5, 1994, Saacks appealed to the Civil Service Commission for the City of New Orleans seeking review of this termination from the police department. The matter was assigned by the Civil Service Commission to a Hearing Examiner pursuant to Article X, Section 12, of the Constitution of the State of Louisiana, 1974. The hearing, which was the longest in Civil Service history, commenced on December 8, 1994 and concluded on March 1, 1995. Following the hearing, the Hearing Examiner rendered a lengthy report finding that the Appointing Authority (the Police Department) had failed to prove sufficient grounds for the disciplinary action taken against appellant. The report contained a recommendation that appellant be reinstated to his former position with all back pay.
On July 19, 1995, the Civil Service Commission, sitting en banc, rendered a decision which deviated from the report of the hearing examiner and upheld the disciplinary action imposed by the Appointing Authority (the Police Department). In an eight page opinion, a majority of the Commission denied Saacks' appeal of his termination. The decision of the Commission, which is appended hereto as Appendix "B," sustained the following charges brought by the Appointing Authority:
1. Rule 2, Section 1, Adherence to Law Rule 4, Section 4, Neglect of Duty

2. Rule 6, Section 3, Public Statements and Appearances

3. Rule 7, Section 1, Use of Departmental Property

The Commission found that these violations supported the disciplinary action imposed on appellant by the Appointing Authority. However, the majority of the Commission was unable to find any violations regarding allegations concerning ownership of "Jimmy C's Sports Bar", Saacks' participation in the movie "JFK" or his alleged association with Frank Caracci, and these charges were not sustained.
Two members of the Commission disagreed with this opinion. One member found that termination was unwarranted, but preferred suspension and demotion. Another member, John P. Nelson, dissented from the majority opinion with lengthy reasons. Commissioner Nelson found no basis for appellant's discharge and determined that appellant should be reinstated to his former position with all back pay.
From the decision of the majority of the Commission, appellant has brought this appeal, assigning eight assignments of error of the Civil Service Commission. These assignments can be consolidated into four arguments:
1. The Chairman of the Civil Service Commission erred in failing to recuse himself.
2. The Commission erred in allowing consideration of the documents which were illegally seized from the offices of L.J. Canal and Antoine Saacks.
3. The Commission erred in not accepting the report of the Hearing Examiner.
4. The Commission was manifestly erroneous in finding that appellant violated departmental rules and that his actions impaired the efficiency of the department.

APPLICABLE LAW
The Louisiana Constitution of 1974 establishes a city civil service which includes "all persons holding offices and positions of trust or employment in the employ of each *440 city having over four hundred thousand population and in every instrumentality thereof." Because the electors of New Orleans failed to exclude its paid firemen and municipal policemen from these provisions by an election called within one year from the date of the constitution, these employees are included in the classified city civil service. La. Const. art. X, Sec. 1(B), 2; Walters v. Department of Police of City of New Orleans, 454 So.2d 106 (La.1984).
A permanent classified City Civil Service employee cannot be subjected to disciplinary action except for cause expressed in writing. He or she may appeal from such disciplinary action to the City Civil Service Commission and the appointing authority has the burden of proof as to the facts. La. Const. art. X, Sec. 8; City Civil Service Rules, Rule II, Sections 4.1, 4.4.
The burden of proof is less in a Civil Service hearing than in a criminal proceeding. Although the facts must be "clearly" established, they need not be established "beyond a reasonable doubt." Lombas v. Department of Police, 467 So.2d 1273 (La. App. 4th Cir.), writ denied, 470 So.2d 120 (La.1985).
The Civil Service Commission has the exclusive power and authority to hear and decide all removal and disciplinary cases, with subpoena power and power to administer oaths. It may appoint a referee to take testimony, with subpoena power and power to administer oaths to witnesses. The decision of the Commission shall be subject to review on any question of law or fact upon appeal to the Court of Appeal. La. Const. article X, Sec. 12(B).
The Supreme Court has formulated jurisprudential precepts to guide the Commission and the courts of appeal in applying these constitutional principles. Walters v. Dept. of Police of New Orleans, 454 So.2d 106, 113 (La.1984) (citations omitted). "Cause" for the dismissal of a person who has gained permanent status in the classified civil service has been interpreted to include conduct prejudicial to the public service in which the employee in question is engaged or detrimental to its efficient operation. The Commission has a duty[2] to decide independently from the facts presented whether the appointing authority has good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the dereliction. Id., (citations omitted).
Legal cause exists whenever the employee's conduct impairs the efficiency of the public service in which the employee is engaged. The appointing authority has the burden of proving the impairment. Cittadino v. Department of Police, 558 So.2d 1311, 1315 (La.App. 4th Cir.1990).
When there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. When there are two permissible views of evidence, the fact finder's choice cannot be manifestly erroneous. Barquet v. Department of Welfare, 620 So.2d 501, 505 (La.App. 4th Cir.1993).

DISCUSSION
Recusal of Sidney Cates
Appellant contends on appeal that the Commission erred in failing to recuse Chairman Sidney Cates from consideration of this matter. According to the Civil Service Rules for the City of New Orleans, regular employees shall have the right to appeal disciplinary actions to the City Civil Service Commission. Rule II, Section 4.1. The rules provide that Commission shall be composed of five members, three of whom shall constitute a quorum. The findings of a majority of such quorum shall control. Rule II, Section 1.1. The rules further provide that the Commission shall elect one of its members Chairman for a term of one year.
*441 The Chairman of the Civil Service Commission at the time of appellant's hearing was Sidney H. Cates, IV. Mr. Cates participated in the majority opinion of the Commission along with two other members of the Commission, G.M. Elie and Glenda Jones-Harris. One member, William R. Forrester, Jr., concurred in the decision and the final member, John P. Nelson, dissented from the majority decision.
During the hearing of this matter, appellant orally raised the issue of recusal of Mr. Cates based on Mr. Cates' previous legal representation of Chief Orticke in a divorce proceeding. The issue was subsequently addressed when defense counsel informed the parties and the hearing examiner during the hearing that both attorneys for the Appointing Authority had previously been employed in Mr. Cates' law firm. After a brief discussion of the issue, counsel for appellant withdrew the motion to recuse Mr. Cates at this time.
However, on July 13, 1996, after the conclusion of the hearing and the rendering of the hearing examiner's report, but prior to the decision of the Civil Service Commission, appellant filed a written motion to recuse Commissioner Sidney Cates. In this motion, appellant stated that he had "just learned" that Mr. Cates and his law firm of Carter and Cates was under contract to perform legal work for the City of New Orleans. Appellant contended that this contract provided substantial fees for Mr. Cates in consideration of his representation of the City in a matter regarding utility rates, and therefore Mr. Cates could not render an unbiased decision in the civil service matter.
After hearing oral argument on this motion, the Commission rendered the following decision:
After hearing extensive argument, the Commission finds insufficient new information offered in support of the motion to recuse, and further finds the motion to be untimely. Said motion is therefore denied.
Relying on the Louisiana Code of Civil Procedure and the Judicial Code of Ethics, appellant contends on appeal of this decision that Mr. Cates was obligated to recuse himself based on an obvious conflict of interest in his representation of the City of New Orleans. Appellant contends that the ruling by the majority upholding the disciplinary action should therefore be deemed null and void. In its brief filed in this Court, the Appointing Authority argues that appellant abandoned the motion to recuse by withdrawing the oral motion urged during the hearing, and that the written motion, which was urged after the conclusion of the hearing was untimely filed.
The City Civil Service Rules contain no provisions relating to the procedure or grounds for recusal of the Commissioners. However, the Civil Service Rules of the State of Louisiana contain the following provision relating to recusal:
The grounds for recusation of a Commissioner or a Referee shall be the same as the grounds for the recusation of judges of the courts of the State of Louisiana.
The grounds for recusation of judges of Louisiana courts are contained in La.C.C.P. art 151, which provides in part that a judge may be recused when he:
(1) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
* * * * * *
(5) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.
Further, La.C.C.P. art. 153 provides that a motion to recuse shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after these facts are discovered, but prior to judgment.
In the present case, appellant discovered the fact that Sidney Cates or his law firm were providing legal representation to the City of New Orleans on a utility matter just before appellant filed the written motion to recuse. The motion was made prior to judgment of the Commission, and was timely *442 filed pursuant to the provisions of La.C.C.P. art. 153.
Further, under the state rules, a judge or commissioner may be recused when he is currently representing one of the litigants in the case before him. As the City Civil Service Commission has jurisdiction over appeals taken by city employees of disciplinary action taken against them, these commissioners exercise the same functions as a judge or state commissioner. In such cases, the presence of bias or conflicts of interest are not uncommon, and a procedure for recusation is therefore an essential element for insuring fundamental fairness and justice to all parties. To the extent the City Civil Service Rules fail to provide for a procedure for recusation of Commissioners, we find the rules to be deficient.
Assuming a contract for legal representation existed between Mr. Cates or his law firm and the City of New Orleans, there is no doubt that Mr. Cates should have been recused from ruling on this disciplinary matter or any other civil service matter where the City of New Orleans is necessarily one of the litigants. However, the record in this case does not contain the actual contract for legal representation between Mr. Cates or his law firm and the City of New Orleans. In the absence of any specific provision in the City Civil Service Rules requiring recusation, and absent any documentary evidence of a contract between Mr. Cates and the City of New Orleans, we are unable to find that the denial of appellant's motion to recuse requires reversal of the Commission's decision in this case.
Seizure of Documents
Appellant argues that the Commission erred in accepting the hearing examiner's finding that the seizure of documents from the offices of Saacks and Lt. Canal was lawful. Prior to the Civil Service hearing, appellant filed a Motion in Limine seeking to exclude all evidence seized from being admitted at the hearing. The Appointing Authority attempted to introduce seized documents at the Civil Service hearing, and the hearing examiner conducted an evidentiary hearing on this motion at this time.
The record of this hearing indicates that on November 24, 1993, Chief Orticke received an anonymous telephone call indicating that records relating to private police detail businesses could be found in the departmental offices of Saacks, Canal, and Major Ronald Serpas. Although the private detail businesses were not part of the MCC complaint, nor was any criminal conduct complained of, Chief Orticke related this information to OMI Director Peter Munster.
Munster contacted the city attorney, who authorized an immediate administrative search of these offices.[3] Munster requested permission from Chief Orticke to search these offices, and Chief Orticke granted the request and instructed Captain Henry Aschebrock and Major Richard Reeves of IAD to accompany the OMI agents and supervise the search for the department. On the same day, OMI conducted an administrative search of the police department offices of Saacks, Canal and Serpas. Although Lt. Canal was present during most of the search of his office, Saacks was not notified of the search or present at the time of the search as he had been suspended from the department the previous day.
As a result of the search, OMI seized a box of documents from Canal's office which were copied and returned to Canal's administrative assistant. Further, OMI seized from Saacks' office cards from his telephone files which were copied and returned to his office. The originals of these documents were never located, however. The Appointing Authority attempted to introduce the copies of these documents at the hearing, at which time appellant urged the Motion in Limine.
The hearing examiner denied this motion and admitted the seized documents which were offered by the Appointing Authority into evidence. The admitted documents supported the Appointing Authority's charges against Saacks of failing to supervise a subordinate, failing to obtain an occupational license, and using departmental property for *443 personal gain. The Commission did not disturb the hearing examiner's ruling.
On appeal to this Court, Saacks contends that the documents were improperly seized and should not have been admitted into evidence. Appellant contends that the search was conducted without his permission, without probable cause and without a search warrant, thereby violating his constitutional rights.
There is no dispute in this case that OMI did not have probable cause or a search warrant to conduct the search of these offices. However, in denying Saacks' motion to exclude the documents, the hearing examiner relied on NOPD operations manual ASOP 48, which provides in pertinent part:
1. All Department property, including vehicles, lockers, desks and personal property therein, shall be subject to search upon the request of a member acting in a supervisory capacity.
2. Every reasonable effort shall be made to conduct the search in the presence of the member responsible for or assigned to that property. When the member is not available, the search shall be conducted in the presence of one of the member's supervisors.
Although the hearing examiner found that Saacks and Canal should have been notified of the search, he found that the provisions of the departmental rule was satisfied as their superior, Capt. Henry Aschebrook of IAD, was present during the entire search. We find no error in this ruling. Based on the evidence in the record before us, we find that the search of Saacks and Canal's offices were legal administrative searches, and the hearing examiner did not err in admitting the seized documents into evidence. We agree with the reasoning stated by the hearing examiner:
... This conclusion takes into consideration that this search was conducted not in private offices or residence, but in N.O.P.D. offices, and desks and file cabinets belonging to the Department. A City employee, especially members of the police department, can not have as high expectation of privacy and a private citizen. The police department is a para military organization, whose members have extraordinary powers. Members of the police department carry guns and badges and have a strict chain of command. Members are subject to the Department's detailed Operations Manual, where ASOP 48.0 is found. ASOP 48.0 is in the nature of a condition of employment, and is necessary to preserve discipline and curb misconduct.
Of course, ASOP 48.0 can not supersede the United States Constitution's Fourth Amendment or the Louisiana Constitution's privacy rights. The Hearing Examiner can envision situations where the Department conducts illegal administrative searches, which cannot be saved even by ASOP 48. But such is not the case herein. The totality of the situation gave OMI and the Department sufficient reason to investigate private businesses being conducted by the Chief Deputy out of police headquarters. If Chief Deputy Saacks and Lt. Canal had wished to keep their business strictly private, they should not have conducted it out of police headquarters. The public's interest in the truth and necessity to investigate and stop police misconduct likewise outweigh Chief Deputy Saacks' privacy interest and the possibility of deterring future unlawful OMI and Department searches of police officers and other city employees.
Further, we find no merit in appellant's argument that the admission of copies of these documents violated the Louisiana Code of Evidence. La.C.E. 1002 allows a duplicate to be admissible to the same extent as an original document. Although this provision is limited by La.C.E. 1004, we find no evidence in this case that the Appointing Authority lost or destroyed the original documents in bad faith. The hearing examiner did not abuse his discretion in admitting these documents.
Failing to Adopt Report of Hearing Examiner
Appellant next contends that the Commission had no reasonable basis to reject the hearing examiner's report.
*444 The Louisiana Constitution, Art. 10, Section 12(B), provides that a hearing examiner's function in municipal civil service proceedings is to take testimony, with subpoena power and power to administer oaths to witnesses. The hearing examiner does not have the authority to make a final decision or to uphold or reverse disciplinary action. That function lies solely with the Commission, and the Commission is not bound to accept the hearing examiner's factual determinations and recommendation. Accordingly, Saacks' contentions on this issue are meritless.
The Charges Against Antoine Saacks
The heart of appellant's argument on appeal is the propriety of the Commission's decision upholding the charges brought against appellant by the police department. Appellant contends in a series of arguments that the Commission erred in finding that the Appointing Authority had proven sufficient cause for the charges against appellant or for the disciplinary action imposed. The disciplinary action in this case was based on several alleged violations of the Departmental Rules and/or Procedures of the police department. We will consider each of the charges made by the Appointing Authority individually.

I. Failure to Obtain an Occupational License

The Commission found that the Appointing Authority met its burden of proving that appellant violated Rule 2, Section 1, Adherence to Law, by failing to obtain an occupational license for the business Police Security Detail, Inc. as required by the New Orleans City Code.
Rule 2, Section 1 and the applicable laws thereto as stated in the termination letter, provide as follows:
Rule 2Moral Conduct
1. Adherence to Law:

Employees shall act in accordance with the constitutions, statutes, ordinances, administrative regulations, of the Unites States, the State of Louisiana and the City of New Orleans, but when in another jurisdiction shall obey the applicable laws. Neither ignorance of the law, its interpretations, nor failure to be physically arrested and charged shall be regarded as a valid defense against the requirements of this rule.

Applicable Laws[4]:
Chapter 70 of the Code of the City of New Orleans: Occupational License Tax...
During the pre-termination hearing held on April 18, 1994, OMI Agent Robert Mehrtens stated that the applicable section of the code which Saacks was accused of violating is Section 70-37 relating to employment agencies. At the Civil Service hearing, Chief Orticke also testified that Saacks was charged with a violation of the section of the code relating to employment agencies. This section provides:
Each person conducting business of an advertising agency using other means than billboard or the business of an employment agency subject to license under R.S. 23:101 et seq. shall pay an annual license of $100.
The record shows that the NOPD officers were hired in their off-duty hours by a private entity, with Saacks' corporation, PSD, acting as a broker between the parties. The officers' wages were paid by the private entity, although PSD usually billed the entity for the officers' time and received a check from the private entity for disbursement to the officers. Although the work was generally performed in Orleans Parish, PSD was incorporated in Jefferson Parish. Under these circumstances, we fail to find any competent evidence that PSD was an "employment agency" subject to the provisions of the New Orleans City Code.
However, the City Code states that the penalty for a violation of this section is that all unpaid licenses shall be deemed delinquent and are subject to the immediate payment of delinquent tax, interest, penalties and costs. There is no evidence in the record that PSD was cited by the city tax collector for failing to pay a license tax for this business. In any event, the appropriate *445 remedy would be payment of delinquent taxes by the corporation.
Prior to the charges against Saacks, detail coordinators at the NOPD were not sanctioned for failure to have occupational licenses. Captain Robert Hecker only obtained an occupational license in June of 1994 after the charges were brought against Saacks. Further, Major Ronal Serpas did not have an occupational license in 1993 for his detail company which he operated during this time. The record shows that the Appointing Authority charged Major Serpas with the identical violation which was brought against Saacks. Major Serpas was suspended from the department for five days, which was reduced by Chief Orticke to three days. Major Serpas appealed this suspension to the Civil Service Commission. Counsel for the Appointing Authority failed to file responsive pleadings to this appeal, and the disciplinary action was reversed.
We find no factual basis in the record for the Commission's determination that this charge supports the disciplinary action imposed on appellant. Our review of the record indicates that by the police department's own actions in an identical case, disciplinary action for this type of violation was not warranted. Accordingly, we do not find that the evidence in the record supports the Commission's conclusion that Saacks' failure to obtain this license supports the disciplinary action imposed, and we conclude that the Commission was manifestly erroneous in upholding this charge.

II. Public Statements and Appearances

The Commission found that Saacks violated the departmental rule which prohibits public statements and media appearances by members of the department without permission from the department. In reaching this conclusion, the Commission stated:
With respect to this charge, the Commission finds as a fact that Saacks did voluntarily appear on television and made public appearances on Angela and Calling Ed Clancy, and did so without consent of the Public Affairs Division of the Department or the Superintendent. This is a clear violation of Rule 6, Section 3, and in no way can be condoned or brushed aside by self-serving statements to the effect that it was done merely in defense. This "going public" by this officer could only cause confusion in the rank and file and be deleterious to the morale of the force, which should be represented by one voice. These public appearances could have easily been refused, and request for remarks could as well have been answered with the usual "no comment" which is the time-honored method in keeping matters from escalating and defusing otherwise explosive situations. Saacks chose to take another course, and in doing so, seriously violated the Department's Rule.
Rule 6, Section 3 provides as follows:
Members shall not publicly criticize or ridicule the Department, its policies, or other members by speech, writing, or other expression, where such speech, writing, or other expression is defamatory, obscene, unlawful, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity.
Members shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or a periodical, release or divulge investigative information, or any other matters of the Department without official sanction or proper authority. Members may lecture on "police" or other related subjects only with the prior approval of the Superintendent of Police.
It is undisputed that after his suspension in November of 1993, Saacks made a number of statements to the press and appeared on local radio and television shows without permission of Chief Orticke or the Public Information Division of the NOPD. The Appointing Authority argued that these appearances constituted a clear violation of Rule 6. In support of this position, the Appointing Authority introduced testimony that there is no exception to this rule for suspended officers or deputy chiefs. The Police Department contends that this rule applies even to personal matters where an ongoing investigation is taking place, as in the case here.
*446 The record contains evidence of several public appearances made by Saacks during his suspension. The first such appearance was a press conference he held on November 24, 1993, the day after his suspension, in which he refuted the allegations of the MCC complaint and denied any wrongdoing. Saacks also responded to questioning by The Times Picayune, in which he referred to the OMI investigation as a "witch-hunt" and to the department's actions in demoting him and not calling it disciplinary action as "crazy." Further, Saacks admitted that during his suspension he accepted invitations to appear on the Angela television show, and well as the Calling Ed Clancy radio show. Saacks contends that he was forced to appear before the media in an attempt to rebut the highly publicized allegations of the MCC, and that he did not believe it was necessary to obtain departmental permission.
The hearing examiner found, after reviewing the media appearances in this case and listening to the testimony and evidence presented, that "Antoine Saacks was simply defending his hard-earned reputation as a highly respected and ranking member of NOPD by asserting that he had not committed any wrongdoing." The hearing examiner concluded that the statements and appearances by Saacks did not constitute a violation of Rule 6.
Evidence presented at the hearing indicated that Rule 6 was in effect to prevent the rank and file police officers from speaking publicly on a departmental matter. There was also testimony presented that this rule did not apply to management level officers. Further, the evidence indicates that the public comments made by the officer would have to be detrimental to the department to constitute a violation. Captain Henry Aschebrock of IAD testified as follows:
Q. Have you ever read the news release?
A. I read the ones that are in here, in the [OMI] report.
Q. In your opinion as an investigator for I.A.D., is that a criticism of the Department or a defense of his actions as alleged by the M.C.C.?
A. I know that there was a lot that he said in his defense. I'm not sure whether any one thing that he said may have been taken as criticism, you know. In order to be a violation, it was ruled that it has to be something that was detrimental to the Police Department or to the Superintendent himself. It had to be some type of slanderous remark or something of that nature.
In addition, Chief Taylor testified at the hearing that the rule regarding public appearances was designed to deal with police matters and did not apply to an officer's media appearances for personal reasons. Chief Taylor testified that he saw "just about all" of Saacks' media appearances and did not find them to be offensive or defamatory to the police department. Chief Taylor also testified that he would not have suspended Saacks for making these appearances and if one of his deputy chiefs had broken this rule while he was superintendent, he would have merely "spoken to him." Further, Chief Taylor testified that unless Chief Orticke specifically ordered Saacks to avoid media appearances, a violation of this rule could not be upheld.
Testimony at the hearing revealed that prior to Saacks' suspension, a Public Information officer brought a television news reporter to Saacks' office at headquarters for an interview regarding the MCC allegations. At this time, Sam Fradella of the Public Information Office instructed Saacks that Chief Orticke wanted Saacks to give this interview to refute the MCC allegations. There was no evidence presented that after this interview was conducted, Saacks was ordered not to speak to the media during his suspension.
We have reviewed the various statements to the media and public appearances made by Saacks during the period of his suspension. We agree with the hearing examiner's conclusion that the nature of these appearances dealt with refuting the public allegations made against him by the MCC. We find no evidence that the statements or appearances were offensive or derogatory to the police department. Commissioner Nelson, in his dissent from the majority opinion, stated as follows:

*447 A reasonable person who listened to, watched or read the Appellant's statement regarding the issues in this case would have to conclude that the publication was made in a professional manner, and it was free of obscene, defamatory and false statements.
Although the majority of the Commission found that Saacks should have not commented on the ongoing investigation, the record indicates that his choice to do so did not constitute a violation of departmental rules. The record shows that Saacks as a ranking officer regularly spoke on behalf of the department while on a crime scene, and he did not need permission of the department to do this. Further, Saacks was never instructed by Chief Orticke to avoid media appearances during his suspension, and in fact, Chief Orticke actually instructed him to respond to the media prior to his suspension. Further, the record supports the hearing examiner's determination that the remarks made by Saacks were not derogatory to the police department, but were an attempt to refute the public allegations of wrongdoing made against him. We find no basis to disturb the findings of the hearing examiner on this issue. The determination of the Commission that appellant's actions constituted a violation of departmental rules is not supported by competent evidence in the record, and is manifestly erroneous.

III. Use of Department Property

The Commission found this to be the most serious of all the charges leveled against Saacks, and concluded that the Appointing Authority had proved a violation of Rule 7, Section 1, which provides:
Rule 7Department Property.
1. Use of Department Property
Members shall use Department property only for the purpose for which it is intended and in accordance with Department policy, rules, procedures, and orders. Members shall exercise care in the use of all Departmental property and equipment and shall promptly report any theft, loss or damage of Department property.
These charges also included a charge of a violation of the rules on Adherence to Law, with the Applicable Law cited as follows:
R.S. 14 Article 67 Theft
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential ...
In reaching this conclusion that appellant violated these rules, the Commission stated as follows:
The Commission finds as a fact that Saacks did use an office in the Department for the purpose of carrying on his personal affairs concerning United Gaming, Inc., and Police Security Details, Inc. He did make use of office and cellular phones to further his private business interest, and never once thought it proper not to do so or tender repayment.
* * * * * *
Furthermore, not only were telephones used for private affairs, but also fax machines, computers and departmental addresses were listed on the various corporations' letterheads and checks. One might well ask again, just by whom was the Appellant employed? Then there are the charges to the movie company. Were the barricades, vans, police cars, and motor scooters really being use free of charge? If so, why do the billings show charges not only for the officers who drove the cars or van, but there are itemized charges for the "van" and for the "barricades". Does this constitute only an error in billing, or is it a charge for the use of City equipment which City policy makes available free of charge? Saacks' corporation got paid in any event and the invoices seem to bear this out.... These are very serious charges and the Commission finds that there is a violation of Rule 7, Section 1, Use of Department Property.
Although Chief Orticke testified that the charge of theft related to Saacks' charges to *448 the production company for city equipment in violation of departmental policy, Captain Aschebrock, who prepared the termination letter, testified that he could not determine why OMI listed this charge in their report. Captain Aschebrock testified:
I am not certain, at all, about what the theft charge was for. It was for overbilling of invoices? I'm not sure if that even existed, really. It could have been for the use of the Department's property.
Captain Aschebrock further testified as follows:
Q. Is that referring to the telephones or to the fax machines or the movie equipment?
A. I assume they are referring to everything that was owned by the city that may have been used without the City's approval or knowledge.
Q. But that is not a charge of theft, is it?
A. No.
From our review of the record, we find that the charge of misuse of departmental property apparently relates to Saacks' alleged use of departmental phones, offices, stationery, fax machines and computers for personal business reasons. The charge of theft apparently relates to the charge that appellant improperly rented city equipment to movie production company.
The record contains a substantial amount of testimony and documentary evidence regarding these charges which were brought against appellant. We will first address the charge of theft in which the Appointing Authority contended that Saacks improperly profited from the use of city equipment by a production company.
The evidence shows that as an incentive to promote business in New Orleans, the City of New Orleans routinely offered city equipment to the various production companies for use in their movies and commercials free of charge. This included police department vans, tow wagons, motor scooters, police cars and barricades to the extent they were available. The city policy as described to the production company officials prior to production was to charge the production company for the manpower to deliver, set-up and retrieve these items, but not to charge for the use of the equipment itself.
During 1993, the films The Pelican Brief and French Silk were produced in the New Orleans area. The production companies for these films contracted with Police Security Details, Inc. to provide security and other services for these productions. As a result of the search of Lt. Canal's office in November 1993, OMI seized copies of a number of invoices which they alleged were submitted to the production companies for payment. Relying on these invoices and other documents including pay sheets and check registers found in Lt. Canal's office, OMI determined that PSD improperly charged the production companies for use of city-owned barricades and vehicles.
At the hearing of this matter, the Appointing Authority introduced several invoices which they alleged were sent to the production companies by PSD for these two films. On some of the invoices, there were charges listed for officers and additional charges which merely stated "van," "tow wagon," or "barricades." The Appointing Authority contended that these invoices constituted proof that Saacks and his business were overbilling the production companies for city-owned equipment. Chief Orticke testified that on the basis on the OMI findings, he charged Saacks with an administrative charge of theft from profiting from the use of city equipment.
However, Saacks testified at the hearing that he did not prepare the invoices for PSD and was not aware that the invoices contained charges for city equipment. In fact, Saacks testified repeatedly during the hearing that regardless of the wording on the invoices, to his knowledge, the production companies were not charged for the use of city equipment. Saacks referred to the city policy of offering this equipment free of charge, and testified that the production companies were aware of this policy.
In addition, Gary Huckabay, the Location Manager for the film The Pelican Brief in 1993, testified that Antoine Saacks and L.J. Canal, through PSD, assisted the production company in obtaining off-duty officers and *449 official equipment and props for this film. Mr. Huckabay stated that at the start of the production, PSD was given purchase orders for each officer or item requested.
Mr. Huckabay testified that he received invoices from PSD which were based on the purchase orders for the officers' services during the course of the film production. He then submitted these invoices for approval and payment to the production manager, the producer and the head accountant for the production company. The invoices are then reviewed and compared with the purchase orders by each of these individuals prior to payment.
Mr. Huckabay was questioned about the items listed on several of the PSD invoices for The Pelican Brief which stated "van" or "tow wagon." The witness stated that regardless of the wording of the invoices, the production company only paid for the manpower to deliver the city equipment, and not for the use of the city equipment. He stated that production companies are tightly budgeted organizations, and the invoices received were compared carefully with the purchase orders set out at the beginning of the film. Mr. Huckabay stated that if PSD had charged the production company for the use of city equipment, he and the production company would have known about it. Mr. Huckabay further stated he was aware that the City had a policy of offering city vehicles and equipment for use in the film free of charge. He specifically testified that to his knowledge, the production company had not been overbilled by PSD, and in fact, the production company was satisfied with the services rendered by PSD.
The hearing examiner found Lt. Canal's record keeping to be unsophisticated, and stated that he doubted Lt. Canal could have deceived the production company officials. The hearing examiner concluded that even if this had occurred, there was no evidence presented that Saacks was aware of this.
The Commission in its decision does not address the testimony of Gary Huckabay that the production company had not been overbilled. The Commission concluded that because Saacks' corporation got paid for these items listed on the invoices, PSD must have charged the production company for the use of city equipment.
The record shows that Chief Orticke based this charge on OMI's findings. Although OMI concluded that PSD charged the production companies for the city equipment, OMI did not receive a complaint of overbilling from production company officials, nor did OMI interview any representatives of the production companies. Rather, OMI based this charge on their interpretation of the invoices which listed city equipment or vehicles as a separate entry on the invoices in addition to the charge for the officers' time. The testimony of the representative of the production company denied that they were charged for use of city equipment.
The only testimony in the record which supports the Appointing Authority's charge is the testimony of OMI Agent Robert Mehrtens, who interpreted the invoices and concluded that PSD was engaged in a scheme of overbilling production companies. However, Agent Mehrtens is not an expert in accounting, and he admitted he did not speak to production company officials regarding these charges.
The evidence in the record that Lt. Canal handled all the billing invoices for PSD is uncontroverted. There were no witnesses who testified that Saacks participated or had knowledge of the billing process of PSD. Lt. Canal failed to testify at the hearing regarding the meaning of these invoices. Absent any evidence that Saacks had knowledge of or participated in alleged overbilling practices, we find that the Commission manifestly erred in finding that Saacks was guilty of violations of theft for improperly renting city equipment.
The Commission further found that Saacks misused his departmental cellular phone to further his private business interests in violation of Rule 7. With regard to this charge, the evidence shows that deputy chiefs and other ranking officers, who are on 24-hour duty, are given cellular phones by the department. The Appointing Authority contended that Saacks made several improper long distance telephone calls to United Gaming to further his private business interests. *450 The record shows that the total amount of these phones calls over a three year period was $50.32.
The hearing examiner found no evidence which set forth the departmental rules and regulations concerning the use of cellular phones. In fact, several witnesses testified that officers were never given any instructions or limitations governing the permitted usage of their cellular phones. Leonard Simmons, the Chief Administrative Officer for the City, testified that there is no prohibition against using cellular phones for personal phone calls. Henry Aschebrock, the Director of IAD, testified that he did not know of any regulation regarding cellular phones.
Further, the record indicates that the custom in the police department was to use cellular phones for personal reasons when necessary. Several police officers, including Chief Orticke, testified that they made personal phone calls on their cellular phones. Chief Orticke stated he has "knowledge that every high-ranking officer that has a cellular phone does make personal telephone calls," but he disputed whether they made business calls.
The record also shows that the department allowed the use of cellular phones to call long-distance. Deputy Chief Stephen Rodriguez testified that he used his cellular phone to make long distance calls. Major Howard Robertson also testified that his cellular phone was used to make long distance calls.
In addition, Madeline Martin, an administrative technician with the police department who handled the long distance telephone billing, testified that approximately one-half of the departmental telephones were used for long distance telephone calls which the department paid for. According to the testimony of several officers, there was no policy in effect which required the police officer to reimburse the City for long distance or local personal telephone calls.[5]
The Commission fails to cite any evidence in the record which indicates that Saacks violated departmental policy by using his cellular phone to make long distance calls. Absent any evidence which indicates that use of cellular phones for personal reasons was prohibited by the department, we conclude that the Commission's determination on this issue is manifestly erroneous.
The Commission also found that fax machines, computers and the departmental address and offices were used for Saacks' private affairs in violation of departmental policy. The hearing examiner found that the testimony and evidence in the record supports a finding that the department allowed the use of departmental property for detail coordination.
With regard to the use of the fax machine, the record shows that Saacks was not charged with misuse of the fax machine, but rather he was charged with failing to properly supervise Lt. Canal's use of the fax for PSD business. Based on records discovered in Lt. Canal's office, OMI alleged that Lt. Canal had used the police department fax machine on six occasions to transmit documents which were not related to police business.
Nevertheless, the hearing examiner found that the departmental policy did not prohibit the use of the fax machine. In fact, there was ample testimony presented that the fax machine was used by many officers for the transmission of personal messages, including use of the fax to notify other officers of available details. The hearing examiner relied on Chief Taylor's testimony that both the teletype and the fax have been used by officers to list available details and that this activity is not a violation of departmental rules. Chief Taylor stated that if Saacks had used the fax machine for personal business, he would not have suspended, fired or even reprimanded him. Absent a showing that Saacks used or authorized use of the fax machine in contravention of departmental *451 policy, we find that the Commission erred in upholding this charge.
With regard to the use of the departmental address on the PSD stationery, the Appointing Authority introduced several invoices which listed the departmental address and telephone numbers as its corporate address. Testimony at trial revealed that many officers used the departmental address and phone number for personal reasons, and specifically for the purposes of arranging details. Captain Anthony Genovese testified that it was common practice for the detail coordinators to list headquarters' address and telephone number on their invoices.
Deputy Chief Stephen Rodriguez testified that he was not surprised to see police headquarters' address or telephone numbers on the billing invoices. He testified:
A lot of the detail information came to the people at Headquarters, because it was coordinated out of Headquarters or out of different areas of the Police Department.
Although Lt. Canal failed to testify at the Civil Service hearing, he stated in his statement to OMI that the invoices which contained the department's address were not printed by him or Saacks, but were given to him as an unsolicited gift by a council member's son. The record also shows that some of the PSD invoices bore the corporation's registered address in Metairie.
With regard to the charge that Saacks improperly used departmental computers and offices for his detail business, we find that the evidence fails to support a violation of departmental rules. Although the testimony indicates that telephone calls were received at headquarters regarding the detail business and that checks were disbursed at headquarters, there has been no showing that this practice constitutes a violation of departmental policy. In fact, the record shows that the department encouraged and supported the participation in private details.
Henry Aschebrock of IAD testified that "there are portions of some details, which out of necessity have to be conducted within the Police Department." Several police officers testified that other detail coordinators operate out of police headquarters with the knowledge of the department. Several officers testified that they receive calls on departmental phones and radios while on duty to work off-duty details. Deputy Chief Duane Johnson, the Appointing Authority's witness, testified that his secretary does work for Lt. Arthur Bertucci, who coordinates a detail for U.N.O. He stated that although most of the work is done at home, his secretary distributes checks to the officers who worked the U.N.O. detail from headquarters during her lunch hour.
Further, Sergeant Harry Mendoza testified that the department cooperated with detail coordination:
Well, the common practice was that everything the Department had, insofar as the details were concerned, was there and it was available. Every level of the Department's ranking structure utilized every means available to them to see that the details were being filed and the other members of the Department were made available the opportunity to work details. Now, with the telephones and then, later on the fax machines, originally the teletype services were all used. It was posted, you know, memos were posted for details. It was a common practice and it has been a common practice. It was really made to actually make it available to make a fair wage.
Further, there was testimony that some of the officers who coordinated details actually used the station checking account to issue checks to the officers who had participated in various private details. Captain Anthony Genovese and Captain Robert Hecker testified that they coordinated details where one check was issued by the private entity and it was deposited in the particular station's checking account. The individual officers were then paid from that account.
The record further shows that Chief Taylor stated at the hearing that there were several detail companies within the police department. He stated he did not believe the use of headquarters for a detail business was a violation of departmental rules. Chief Taylor was questioned as follows:

*452 Q. Is it your testimony that Mr. Saacks and Mr. L.J. Canal just having a detail company out of the Police Department is a violation? Is that alone a violation?
A. That alone would not have been a violation, but if the other things that were asked, such as using the fax machine and making a profit off of the Department's property, that would be a violation.
Use of the departmental office and equipment for detail coordination purposes was a common practice in the police department, and we find no support in the record for the Commission's determination of a violation of departmental rules and regulations. Under the circumstances presented here, where the police department supported the officers' effort to work off-duty details and was aware that details were coordinated out of headquarters, we find that the Commission erred in upholding this charge against appellant. We find the Commission's determination on this issue to be manifestly erroneous.

IV. Neglect of Duty

The Commission next determined that the Appointing Authority had proven a violation of Rule 4, Section 4 with regard to Saacks' duty to supervise his subordinate, L.J. Canal.
The rule, as cited in the termination letter, provides as follows:
Rule 4Performance of Duty
4. Neglect of Duty
a. Each member, because of his grade and assignment, is required to perform certain duties and assume certain responsibilities. A member's failure to properly function in either or both of these areas constitutes a neglect of duty.
b. A member with supervisory responsibility shall be in neglect of duty whenever he fails to properly supervise subordinates, or when his actions in matters relating to discipline fail to conform with the dictates of Departmental Rules and Regulations.
c. The following acts or omissions to act, although not exhaustive are considered neglect of duty:
6. Failing to comply with instructions, oral or written, from any authoritative source.
The charge of neglect of duty can be divided into two separate allegations. First, Saacks is charged with failing to supervise Lt. Canal in the manner in which Canal managed the private detail business, in violation of section 4(a) and (b). Secondly, Saacks is charged with a violation of section 4(c), by neglecting his duty to obtain authorization forms for his outside employment with PSD and UGI.[6]
With regard to the charge of neglect of duty to supervise L.J. Canal, the Commission stated in its decision:
If Lt. L.J. Canal (too ill to be called as a witness) was in charge of the business on a day to day basis, it was Saacks' responsibility to properly exercise command supervision over this lower ranking officer, and he cannot simply excuse any wrongdoing by saying that it was Canal's responsibility.
The Appointing Authority contended at the hearing that Canal's actions in using the police department address and telephone number on the billing invoices for PSD, using the departmental fax machine for PSD business, and allegedly overbilling the production companies for city-owned equipment are violations of departmental rules. The Appointing Authority contended that as Saacks was a partner in the private venture with Lt. Canal, Saacks knew or should have known of these alleged violations.
Saacks testified at the hearing that Lt. Canal completely managed the business of PSD, and that Saacks had no knowledge of any of the alleged improprieties regarding Lt. Canal's management of PSD. This testimony was corroborated by other witnesses who testified that they only dealt with Lt. Canal on PSD business, and not with Saacks. *453 Lt. Canal did not testify at the hearing concerning his activities.
The hearing examiner specifically found that Saacks did not know of and was not involved in Lt. Canal's billing practices in connection with PSD. In fact, the record shows that several witnesses corroborated Saacks' testimony by stating that they only dealt with Lt. Canal for PSD business.
The Commission has failed to cite to any evidence in the record which contradicted Saacks' testimony or establishes a basis for holding Saacks liable for improperly supervising Lt. Canal. We have carefully reviewed the record, and fail to find any evidence to support the police department's charge that Saacks knew or should have known of alleged improprieties of Lt. Canal, or that he failed to properly supervise Canal's activities. We find the Commission's determination to the contrary to be manifestly erroneous.
Moreover, the hearing examiner found that the true intent of Rule 4 is to govern the supervision that occurs within the parameters of police work. The Commission failed to offer any evidence in dispute of this finding, and the record contains no evidence which indicates otherwise. In light of the evidence in the record, we find the hearing examiner's interpretation of this rule to be reasonable.
The charges against Saacks are confined primarily to his alleged failure to supervise Lt. Canal's actions in handling the bookkeeping for the privately owned security business. There was no testimony or evidence presented that Canal was failing to perform his police department duties, and the Commission does not rely on any evidence that such was the case. We find that the Commission erred in finding Saacks in violation of the departmental rule requiring him to supervise his subordinates, when there was no showing the alleged lack of supervision related to police work.
Further, Chief Orticke testified that the charge of failure to supervise a subordinate can only be upheld if the subordinate is found to have violated a rule. The record indicates that L.J. Canal has never been charged with any type of violation of departmental rules. Although OMI recommended Canal be charged with several violations of departmental rules, the department chose not to charge or discipline Canal for these alleged violations.[7]
In addition, at the time of these alleged infractions, there were two supervisors in the chain of command between Canal and Saacks, one of whom was (former Deputy) Chief Orticke. Although these officers were in direct supervision of Lt. Canal's activities, these supervisors have not been charged with neglect of duty.
The record contains insufficient evidence to prove that Saacks was in violation of Rule 4(a) and (b). We find the hearing examiner's determinations to be reasonable and supported by the record. We find no rational basis for the determination of the Commission. Under these circumstances, we find that the Commission's determination that Saacks was in violation of the departmental rule of neglect of duty to be manifestly erroneous.
We will next address the Commission's determination that Saacks failed to obtain departmental permission to operate Police Security Details, Inc. or to work with United Gaming, Inc. Within the charge in the termination letter relating to neglect of duty, the Appointing Authority cited the following violation:
4. Neglect of Duty
c. The following acts or omissions to act, ... are considered neglect of duty:
6. Failing to comply with instructions, oral or written, from any authoritative source;
In support of this charge, the letter cited to NOPD Operations Manual ASOP 85.0 relative to Paid Detail/Outside Employment, which provides in pertinent part:
4. Members wishing to work any paid details or engage in outside employment *454 shall complete a New Orleans Paid Detail/Outside Employment Authorization Form # 121 prior to working the paid detail/outside employment ...
The Appointing Authority contends that Saacks participated in outside employment without permission of the police department and therefore is in violation of Rule 4, Section 4 and ASOP 85.0.
On appeal, appellant contends that a reading of the decision of the Commission indicates that the Commission did not sustain the charge of failing to submit authorization forms for outside employment. However, the ruling of the Commission does not clearly exonerate appellant on this issue. In its decision, the Commission stated:
It is clear that Saacks operated the "Police Security Details, Inc." without an occupational license and without permission from the Police Department, and without a doubt, profited from the operation of the business. (Emphasis ours.)
Further, our reading of the Commission's decision indicates that the Commission found as a violation Saacks' failure to submit an outside employment authorization form for his association with UGI. Although this violation is contained in the section of the decision relating to "Associations," the Commission nevertheless found that Saacks' connection with United Gaming constituted outside employment for which he had not received departmental permission. The Commission stated:
The majority of the Commission is unable to find any violations regarding allegations concerning ownership vel non of "Jimmy C's Sports Bar", the appellant's participation in the movie "JFK" or in his alleged association with convicted felon, Frank Caracci. However, his receipt of a large sum of money, $325,000.00, raises questions again concerning for whom was the appellant actually working? This has to, and the Commission so finds, constituted [sic] outside employment on a very large scale indeed and violated ASOP 85.0 relative to outside employment. (Emphasis ours.)
We interpret this language of the decision to mean that the Commission determined that the Appointing Authority did prove the charge of failure to obtain authorization forms for Police Security Details, Inc. and for UGI. We will therefore address the issue of whether this decision was based on sufficient evidence in the record.
Police Security Details, Inc.
Saacks conceded at the hearing that he was an owner of the business PSD, but contended that he did not actually work a detail for the business, acting only as the contact person between the production companies and the police officers. However, the hearing examiner found that the evidence in the record supported the fact that Saacks worked for PSD, and that he was not merely an owner of the corporation as he claimed. Accordingly, the hearing examiner concluded that Saacks was therefore required to obtain authorization from the department to conduct this business.
Saacks claimed that to his knowledge Lt. Canal submitted an authorization form for PSD in both Canal's and Saacks' names. Although the hearing examiner apparently found Saacks' testimony concerning the existence of the form credible, concluding that it would satisfy the requirement of ASOP 85.0, the Commission sustained the charge finding that Saacks operated PSD "without permission from the Police Department."
We have carefully reviewed the record to determine whether there is evidence to corroborate Saacks' testimony that Lt. Canal submitted a form in his name for the detail business. Lt. Christopher Maurice, the Commander of the Inspections Department which maintains the detail forms, testified that he did not find an authorization form for Saacks although he did find a form for Lt. Canal which dealt with "movie details." He could not recall whether this form was in the name of Police Security Details, Inc. However, Lt. Maurice testified that the police department does not maintain computer records of all detail forms submitted, but purges its files each year. In fact, the record shows that the department was unable to locate forms submitted for paid detail or outside employment by other officers. Chief *455 Taylor and Chief Orticke both admitted at trial that they had private businesses for which they had submitted authorization forms, but the police department records failed to reveal any evidence of these forms. Nevertheless, Saacks was unable to produce a copy of the authorization form which was allegedly submitted by Lt. Canal for the business, and Lt. Canal did not testify on Saacks' behalf.
Commissioner Nelson, in his dissent, described the City's system of maintaining these records as "extremely faulty." Our review of the record leads us to conclude that the police department did not maintain an accurate record of authorization forms submitted by police officers sufficient to prove conclusively that no form was submitted by Saacks for this detail business. Although this sloppy and inaccurate system may cause us to conclude that the Appointing Authority failed to prove that Saacks violated departmental rules, we may not disturb the Commission's findings of fact unless it is clearly wrong. On appellate review, we are bound by the standard set forth by our Supreme Court, and it is well-settled that we may not disturb a factual finding of the Commission absent manifest error, even if our own review of the record leads to a different conclusion.
In view of the lack of testimony or documentary evidence presented by Saacks to sustain his self-serving testimony that "to his knowledge" Lt. Canal submitted the proper form for him, we find the Commission's determination that no form was submitted to be a reasonable one. We therefore conclude that the Commission's determination that Saacks violated ASOP 85.0 by failing to submit an authorization form for the business PSD was not manifestly erroneous.
We do find, however, that the evidence in the record fails to support the disciplinary action imposed based on this charge. Captain Robert Hecker and Major Ronal Serpas, both detail coordinators, testified that although they did not submit detail authorization forms for their coordination efforts prior to 1993, they did so after charges were filed against Deputy Chief Saacks and were not reprimanded or sanctioned by the department. The Appointing Authority's argument is that the punishment for a deputy chief should be more severe based on his position in the department. Nevertheless, Chief Taylor testified that he was aware that Saacks and Lt. Canal were coordinating the details for movie production companies, and that the only sanction for failing to submit an authorization form would be to require that the forms be submitted.
United Gaming, Inc.
Appellant next argues that the Commission erred in finding that he was employed by United Gaming, Inc. (UGI), without permission of the department. We find no merit in this argument.
The Appointing Authority contended that based on Saacks' admission that he had worked "thousands of hours" for UGI and on Saacks' receipt of $325,000.00 in settlement funds from UGI in 1993, Saacks was working for UGI and was therefore required to obtain permission from the department pursuant to ASOP 85.0. Saacks obtained written permission from Chief Taylor in 1992 to work as a security consultant and detail organizer for Video Services, Inc. However, Chief Taylor testified that he did not remember signing the authorization form, and would not have signed it if he knew the business involved gambling operations. In addition, the authorization form which was signed in 1992 was submitted after Saacks had engaged in lengthy negotiations with UGI, and Saacks was in violation of departmental rules by failing to submit this form earlier. The record contains a letter dated July 14, 1993 from Saacks to Fred Wilms, Chairman of the Board of UGI, outlining an oral agreement between Saacks and UGI to obtain an ownership interest in the UGI subsidiary, Video Services, Inc. OMI and the police department relied on this letter as evidence that Saacks and UGI had an oral agreement for employment. In addition, the Appointing Authority relied on the $325,000.00 received by Saacks from UGI as evidence that Saacks had an employment relationship with UGI.
The hearing examiner found, however, that Saacks was never employed by UGI based on the testimony of Carol Carter, the President *456 of UGI, that at the time in question there was never any employment agreement with Saacks in effect. The hearing examiner found that OMI and the police department's reliance on Saacks' statements that he worked thousands of hours for UGI to be misplaced because Saacks consistently testified that these hours were not paid employment, but was time invested to become part owner in a local business if and when it was formed.
Further, the hearing examiner found that the settlement was paid by UGI to avoid the possibility of litigation rather than as compensation for work performed or services rendered by Saacks. In reaching this conclusion, the hearing examiner relied on the testimony of Robert Woodson, a UGI official, who stated that the settlement funds represented damages paid for loss of a future ownership interest.
The evidence presented on whether Saacks sought and obtained departmental permission to become employed by UGI is conflicting. Resolution of this conflict turned on issues of credibility determinations which are solely within the discretion of the trier of fact, in this case, the Civil Service Commission. The Commission apparently resolved this factual issue by determining that Saacks was employed by UGI without departmental permission, in violation of departmental rules. Although if sitting as a trier of fact we may have reached a different conclusion and resolved the conflict in testimony differently, our review of the record indicates that the Commission's view of the evidence presented was based on competent evidence and reasonable inferences of fact. Based on Saacks' own statements that he spent two-three thousand hours working for UGI, as well as the fact that he received $325,000 from UGI, we conclude that the Commission's determination that the Appointing Authority met its burden of proving a violation of ASOP 85.0 with regard to UGI was not manifestly erroneous.

Efficiency of the Department
Appellant contends that the Commission erred in finding that Saacks' conduct impaired the efficiency of the public service.
Louisiana law provides that the Appointing Authority must prove by a preponderance of the evidence the occurrence of the complained of activity and prove that the conduct complained of impaired the efficiency of the public service and that it bears a real and substantial relationship to the efficient operation of the public service. Newkirk v. Sewerage and Water Bd. of City of New Orleans, 485 So.2d 626 (La.App. 4th Cir.), writ denied, 489 So.2d 920 (La.1986); Cittadino v. Department of Police, supra. The Appointing Authority must not only prove the occurence of cumulated charges or "incidents," but must prove that they resulted in a detrimental effect on the efficient operation of the department. Reboul v. Department of Police, 420 So.2d 491, 495 (La.App. 4th Cir.1982).
The Commission in its opinion found that because of appellant's rank in the police department he should have known that his actions were improper. The Commission stated as follows:
The record discloses an employee of long service, and one who is both intelligent and extremely articulate. Certainly he has to be aware of just what it was he was about. He had to understand that his actions had a substantial relationship to the efficient operation of the public service and reflected on the Department in a manner completely out of harmony with his position as Deputy Superintendent of Police. The higher one rises in position, the more careful scrutiny with which one must view his various actions.
* * * * * *
The Appellant has failed to conform to the high standard of behavior expected of a Police Captain, (not to mention a Deputy Superintendent of Police), and his conduct on the whole is highly prejudicial and unbecoming of one who is sworn to protect and serve the best interests of the public.
Our review of the record indicates that the evidence presented at the hearing reasonably supports this conclusion. However, we note that the record shows that the police department encouraged and supported members' participation in private details, and officers *457 routinely used departmental property to further this objective. The department was further aware that several officers coordinated details, and used police headquarters for this purpose. Further, there was testimony in the record that it was "common knowledge" among many members of the department, including the Chief of Police, that Antoine Saacks was involved in pursuing a later career in the video poker industry.
The Mayor who served during this time testified that he knew that Saacks was lobbying the legislature for the passage of video poker, and had no problem with that if the Chief of Police approved. The Mayor stated he knew that Saacks was involved with the video poker machines at the racetrack and stated there was nothing illegal about this.
Further, we find that the record shows that the charges against Saacks which were properly upheld by the Commission involved his activities outside the parameters of his work in the police department. We fail to find evidence sufficient to indicate that Saacks' involvement in the gaming industry or in the detail business affected the performance of his duties with the police department. Rather, the record shows that Saacks had an outstanding record of achievement during his tenure with the department.
Under the circumstances presented here, we conclude that although the Appointing Authority may have proven that Saacks' actions impaired the efficiency of the department, the disciplinary action imposed by the Commission was not commensurate with the derelictions proven by the department.

CONCLUSION
For the reasons stated herein, we conclude that the decision of the Civil Service Commission in favor of the City of New Orleans, finding that certain activities of Saacks violated departmental regulations and that the Appointing Authority had legal cause for disciplining him, was not clearly wrong. We find however that the Commission was clearly wrong in upholding the penalty of termination imposed by the Appointing Authority.
Antoine Saacks has a long record of distinguished service with the New Orleans Police Department. That notwithstanding, the Appointing Authority concluded that he should no longer be permitted to serve in any capacity and chose to terminate his service rather than suspend or demote him.
Dismissal is the most severe of disciplinary actions that can be taken by the Appointing Authority. See City Civil Service Rule IX, Section 1.1(b) (cited in Appendix "A", page 461). Considering Saacks' record and the fact that the proven violations of departmental rules did not affect the performance of his police department duties, we find the penalty of dismissal to be excessive.
We therefore affirm the decision of the Commission, but amend the judgment to reduce the penalty of termination of service to that of involuntary retirement effective November 23, 1993. All costs of this appeal are assessed equally to the parties.
AFFIRMED AS AMENDED.

APPENDIX `A'

April 19, 1994

OUR REF:2702 1DA
Captain Antoine Saacks, Jr.
Social Security # XXX-XX-XXXX
321W. Robert E. Lee
New Orleans, LA 70124

RE: I.A.D. Case # 93-719R

O.M.I. Case # 93-194-4
Captain Saacks:
An administrative investigative report alleging violations of Departmental Rules and/or Procedures, regarding Adherence to Law, Neglect of Duty, Truthfulness, False or Inaccurate Reports, Public Statements and Appearances, Use of Department Property, and Associations, has been submitted to my office for the determination of disciplinary action. This investigation was conducted by Agent Robert Mehrtens of OMI.
This investigation has determined that you violated numerous Police Department rules and regulations as a result of your involvement with companies known as United Gaming, Inc., Video Services, Inc., Police Security *458 Detail, Inc., and other outside employment ventures. These violations range from your failure to secure permission to become self employed in your various business ventures, to using Department property to further your private business interests. Violations were found as a result of your personal and business relationships with a convicted felon, by you making unauthorized statements and appearances to the media concerning this Departmental matter, by you failing to secure permission for outside employment, and by your failure to secure the necessary permits to conduct such businesses.
The investigation produced evidence which shows that you were co-owner with Homicide Unit Commander Lieutenant L.J. Canal in a company known as Police Security Detail, Inc. Evidence uncovered in the investigation has led to you and Lieutenant Canal being cited for violating numerous Police Department and Civil Service rules and regulations ranging from Adherence to Law (Theft), from the misappropriation of funds received from the unauthorized rental of City vehicles and equipment, to operating this company without an Occupational License and without permission from the Police Department. As a result of the investigation, OMI concluded, "Although insulated to a degree by Lieutenant Canal's admission that it was he who operated Police Security Detail, Inc. on a daily basis, Chief Saacks also personally profited from the submission of fraudulent invoices to the production company (LA. R.S. 14:67Theft), and from the unauthorized use of Department/Public property (LA. R.S. 14:68Unauthorized Use of a Moveable)."
Lieutenant Canal acknowledged it was he who handled the day to day operations of this company, and characterized Chief Saacks' duties as mostly negotiating with the production companies, public relations, and entertainment of potential clients. Chief Saacks basically agreed with this assessment of their duties by Lieutenant Canal, but added that he did consult with Lieutenant Canal, had discussions with him about the company's activities, and would assist him whenever needed. Lieutenant Canal and Chief Saacks both acknowledged their company did not have an Occupational License to operate in Orleans Parish.
OMI also determined, "In his Administrative Statement, Chief Saacks said he first became associated with United Gaming, Inc. in early 1990, and worked an approximate total of two to three thousand hours trying to set up a local Video Poker company until he settled with United Gaming, Inc. in August of 1993. Chief Saacks stated in his News Release of November 24, 1993 that he "worked thousand of hours for over 3 years assisting United Gaming, Inc. of Las Vegas, Nevada in it's efforts to have it's machines placed in this state." Chief Saacks went on to say in this News Release he "neither requested nor was paid any type of remuneration for my services, but rather requested that I be allowed to invest in and be part owner of the local retail corporation in Louisiana if and when it was formed." He then goes on to explain his receiving a $325,000.00 settlement from United Gaming, Inc., which he concluded was substantially less than the worth of his anticipated ownership in Video Services, or the Security Consultant contract. In his July 14, 1993 letter to the Chairman of the Board of United Gaming, Inc., Mr. Fred Wilms, Chief Saacks referred to an agreement he had with United Gaming, Inc. since the "very beginning of our relationship." He also tells Mr. Wilms, "I have carried out my part of the bargain," and "I am entitled to one sixth ownership of Video Services, Inc." He concludes his comments by advising Mr. Wilms that "oral contracts are enforceable in Louisiana" and that unless his demands are met he will retain legal representation and file suit against United Gaming, Inc.
These statements by Chief Saacks reveal his belief that he entered into an oral contract with United Gaming, Inc. at the beginning of their relationship in 1990. Chief Saacks expected, demanded, and received remuneration ($325,000.00) for the work he did in assisting United Gaming, Inc. to open a local company under the corporate name of Video Services, Inc.
Therefore, Chief Saacks was self employed at the very beginning of his relationship with United Gaming, Inc., a relationship he himself has referred to as an "oral contract". As *459 such, Chief Saacks was required to seek permission from the Police Department before he did the "thousands" of hours of work for United Gaming, Inc./himself.
Additionally, OMI has determined, "In his Administrative Statement, Chief Saacks acknowledged prior ownership of "Jimmy C's," a sports bar located in Jefferson Parish. When asked if he had authorization from the Police Department (Paid Detail/Outside Employment Authorization Form) to own this alcoholic beverage outlet, he did not give a direct response. His reply was that he was only an investor in the business, made no money from the business, and noted the business was not located in Orleans Parish. We know already, however, that he did not have authorization from the Police Department to own this alcoholic beverage outlet.
Chief Saacks also acknowledged having a minor role in the movie "JFK" which was filmed in New Orleans. Chief Saacks said he was paid to act in this movie, and admitted he did not submit a Paid Detail/Outside Employment Form for permission from the Police Department to take the part in the movie."
Further, OMI, determined, "Documents discovered in the search of Lieutenant Canal's office revealed he and Chief Saacks were co-owners of a company known as Police Security Detail, Inc. In their Administrative Statements, Chief Saacks and Lieutenant Canal said this company was formed to provide off duty New Orleans Police Officers to work security details for companies located in New Orleans. Most of the work done through this company was to provide security for various movie production companies that come to New Orleans to Film motion pictures, television movies and programs, and commercials."
Lieutenant Canal and Chief Saacks both acknowledged their company did not have an Occupational License to operate in Orleans Parish. Chief Saacks also admitted he did not submit a Paid Detail/Outside Employment Form, as required, for him to receive permission from the Superintendent to be an owner of this company.
Additionally, OMI found numerous violations to be sustained against Lt. Canal and cites Chief Saacks, stating, " Chief Saacks failed to properly supervise Lieutenant Canal in the operations of Police Security Detail, Inc. thereby allowing the violations documented against Lieutenant Canal to go unchecked."
OMI also determined that, "Beginning with his News Release on November 24, 1993 Chief Saacks has made numerous statements to the press concerning this Departmental disciplinary matter. He has also appeared on a number of local television and radio shows (examples: "Angela" & "Calling Ed Clancy") and discussed the issues of this case. Chief Saacks even received telephone calls from the general public on the Ed Clancy show and commented on their inquiries about this Departmental matter. All of this was done without the consent of the Public Affairs Division/Superintendent of the New Orleans Police Department."
OMI has determined that, "In his Administrative Statement, Chief Saacks acknowledged using his Department telephones, office and cellular, to make long distance calls to United Gaming, Inc. in Las Vegas, NV, to further his private business interests. Chief Saacks also said he did not reimburse the Department/City for such use."
Additionally, OMI has determined that Chief Saacks personally profited from the unauthorized use of City/Department property by Police Security Detail, Inc. Records seized from Lt. Canal's office document that Police Security Detail, Inc. charged companies for the use of police equipment such as barricades, police cars, police scooters, Crime Lab Van and a Coroner's Van. Additionally the records show that Lt. Canal had used or directed the use of Department property such as a FAX machine, telephones and computer for the use of their company.
OMI has determined that Chief Saacks admitted association with a convicted felon, Frank Caracci. It is apparent he made no effort to check Frank Caracci's criminal history or the effect of a pardon Caracci received from the State of Louisiana on the Federal conviction. He also rejected as dated Superintendent Giarrusso's objection to *460 the pardon, an objection in which he advised the Attorney General of the State of Louisiana that Frank Caracci has been identified as an organized crime figure in New Orleans.
The OMI investigative findings, under OMI # Case 93-194-4, is attached hereto and made a part of this disciplinary letter, in order to provide a thorough and complete explanation of all charges.
To afford you an opportunity to present facts in mitigation or to explain your conduct, a hearing was held in my office on April 18, 1994. At that hearing you and your attorneys, Robert Harvey and Julien Murray offered arguments on your behalf in an effort to mitigate, justify or explain your behavior as heretofore outlined.
After a thorough and complete review of the entire investigative report, I find that your conduct, as outlined above, constitutes violations of Adherence to Law, Neglect of Duty, Public Statements and Appearances, Use of Department Property, and Associations. This type of conduct by a Police Officer cannot be tolerated, especially by a senior officer who has the responsibility for supervising other officers.
These Rules read as follows:
RULE 2
MORAL CONDUCT
1. ADHERENCE TO LAW

Employees shall act in accordance with the constitutions, statutes, ordinances, administrative regulations, and the official interpretations thereof, of the United States, the State of Louisiana, and the City of New Orleans, but when in another jurisdiction shall obey the applicable laws. Neither ignorance of the law, its interpretations, nor failure to be physically arrested and charged, shall be regarded as a valid defense against the requirements of. this rule.
APPLICABLE LAWS
CHAPTER 70 OF THE CODE OF THE CITY OF NEW ORLEANS OCCUPATIONAL LICENSE TAX ...
R.S. 14 ARTICLE 67 THEFT
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential...
RULE 4 PERFORMANCE OF DUTY
4. NEGLECT OF DUTY
a. Each member, because of his grade and assignment, is required to perform certain duties and assume certain responsibilities. A member's failure to properly function in either or both of these areas constitutes a neglect of duty.
b. A member with supervisory responsibility shall be in neglect of duty whenever he fails to properly supervise subordinates, or when his actions in matters relating to discipline fail to conform with the dictates of Departmental Rules and Regulations.
c. The following acts or omissions to act, although not exhaustive are considered neglect of duty:
6. Failing to comply with instructions, oral or written, from any authoritative source;
ASOP 85.0 PAID DETAIL/OUTSIDE EMPLOYMENT
. . .
4. Members wishing to work any paid details or engage in outside employment shall complete a New Orleans Police Paid Detail/Outside Employment Authorization Form # 121 prior to working the paid detail/outside employment, except under circumstances stipulated in paragraph 13 and 15. Paid Detail/Outside Employment Authorization Forms are available in each unit and the Personnel Division and shall be completed and disseminated as indicated on the form.
5. Paid details and/or outside employment shall not interfere with the member's performance of duty. While working paid details and/or outside employment, *461 members shall be governed by all departmental policies, rules, procedures, and orders, and shall enforce all State, Municipal and Federal laws.
6. Non-commissioned, de-commissioned, reserve, or suspended members shall not accept or engage in paid details. Members on Limited Duty shall not accept or engage in paid details and/or outside employment without specific authorization from the Superintendent of Police.
8. When working paid details, the member shall notify the District in which the detail is located of the date, time, and exact location of the detail, and such information shall be recorded in a District Paid Detail Log Book. District Platoon Commanders shall make themselves aware of all locations where members are working paid details during the Platoon Commander's tour of duty.
18. Paid Details and outside Employment at ABO outlets may be considered on an individual basis by the superintendent. Members desiring to work any such locations shall complete the Form 21 along with a request to work at an ABO outlet. These forms are to be sent to the Superintendent through the member's chain of command prior to working at the location. Authorization to work ABO locations shall be in writing and signed by the Superintendent...
RULE 6 OFFICIAL INFORMATION
3. PUBLIC STATEMENTS AND APPEARANCES
Members shall not publicly criticize or ridicule the Department, its policies, or other members by speech, writing, or other expression, where such speech, writing, or other expression is defamatory, obscene, unlawful, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity.
Members shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or a periodical, release or divulge investigative information, or any other matters of the Department without official sanction or proper authority. Members may lecture on "police" or other related subjects only with the prior approval of the Superintendent of Police.
RULE 7 DEPARTMENT PROPERTY
1. USE OF DEPARTMENT PROPERTY
Members shall use Department property only for the purpose for which it is intended and in accordance with Department policy, rules, procedures, and orders. Members shall exercise care in the use of all Departmental property and equipment and shall promptly report any theft, loss or damage of Department property.
RULE 5 RESTRICTED ACTIVITIES
2. ASSOCIATIONS
Members shall avoid regular or continuous associations or dealings with persons whom they know, or should know, are racketeers, sexual offenders, gamblers, suspected felons, persons under criminal investigation or indictment, or who have a reputation in the community for present involvement in felonious or criminal behavior, except as necessary in the performance of official duties, or where unavoidable because of family relationships of members.
Moreover, your conduct is contrary to the standards as prescribed by Rule IX, Section 1., paragraph 1.1, of the Rules of the Civil Service Commission for the City of New Orleans. This Rule prescribes:

RULE IX

DISCIPLINARY ACTIONS
Section 1. MAINTAINING STANDARDS OF SERVICE
1.1 When an employee in the classified service is unable or unwilling to perform the duties of his/her position in a satisfactory manner, or has committed any act to the prejudice of the service, or has omitted to perform any act it was his/her duty to perform, or otherwise has become subject *462 to corrective action, the appointing authority shall take action warranted by the circumstances to maintain the standards of effective service. The action may include one or more of the following:
(1) removal from the service.
(2) involuntary retirement.
(3) reduction in pay within the salary range for the employee's classification, subject to the provisions of Rule IV, Section 8.
(4) demotion to any position of a lower classification that the employee is deemed by the appointing authority and the Director to be competent to fill, accompanied by a reduction in pay, which is within the salary range for the lower classification, subject to the provisions of Rule IV, Section 8.
(5) suspension without pay not exceeding one hundred twenty (120) calendar days.
(6) fine.
(as amended June 10, 1982, effective June 10, 1982)
In light of the above investigation, and due to the serious nature of your violations, you are hereby notified that you are to be suspended for a period of One Hundred Nineteen (119) calendar days and dismissed from your employment with the New Orleans Police Department. The suspension began as an emergency suspension on November 23, 1993 and ended on March 21, 1994. Effective April 19, 1994, your employment with the New Orleans Police Department, City of New Orleans, is hereby terminated.
You are advised that you may have a right to appeal this decision to the Civil Service Commission for the City of New Orleans within thirty (30) days from the date of this letter.
 Very truly yours,
 /s/ Joseph M. Orticke, Jr.
 JOSEPH M. ORTICKE, JR.
 Superintendent of Police
JMO:hla
cc: Department of City Civil Service
Office of Municipal Investigations
NOPD Personnel Office
NOPD Payroll Section
NOPD Pension Board
NOPD Credit Union
Internal Affairs Division

APPENDIX `B'

ANTIONE SAACKS

VS.

DEPARTMENT OF POLICE

CIVIL SERVICE COMMISSION

CITY OF NEW ORLEANS

NO. 4890
This matter was heard by the Commission sitting en banc. The appellant, Antoine Saacks, a Captain with the Department of Police and a classified civil servant with the City of New Orleans was, for the reasons set forth below, dismissed from his position with the department following a suspension of 120 days. The Commission by minute entry dated February 17, 1994 noted its lack of jurisdiction on an appeal taken from the suspension and dismissal of Mr. Saacks as an unclassified civil servant, i.e. a Deputy Superintendent of Police. However, this appeal is made by the appellant by virtue of his permanent status as a Police Captain in the City's classified civil service, having taken a leave of absence from that position to accept the unclassified position as Deputy Superintendent.
The Commission has thoroughly reviewed the record in this matter, including the factual findings made by the Hearing Examiner. The Commission recognizes that Appellant has a distinguished career over a period of years with the New Orleans Police Department. Indeed it was Appellant's superior job performance and aggressive attitude that was the basis for his rise through the ranks to attain the position of Deputy Superintendent of Police. Appellant developed during his career as a Police Officer a growing interest in supplementing his income with business activities. It is the propriety of *463 Appellant's conduct of his outside business interests which is the primary subject matter of this proceeding.
Though the NOPD has for many years permitted its police officers to engage in outside business activities, such as paid details and part-time employment with private companies, restrictions are imposed so that the nature and/or extent of the outside employment does not reach the point where it discredits the Department or impairs the responsibility of the Police Officer to fully perform the duties owed to the Department of Police. Our review of the record convinces us that the Appointing Authority carried its burden of proof that Appellant's misconduct related to his outside business interests justifies his termination.
It may be noted that this appeal has been the longest and perhaps, the one receiving the most notoriety, that the Commission has ever heard. The testimony of 32 witnesses is embodied in some 18,000 pages of testimony, and the record contains a total of 112 exhibits submitted by the parties. The Commission has taken into consideration the testimony, the exhibits, the law and the evidence in reaching its decision. From the disciplinary letter, exhibit no. 54, dated April 11, 1993 at page three the following four charges are alleged, and the specifications are indicated under each charge, together with a citation to the law and the various rules of the Department of Police that are applicable in each instance.

I. ADHERENCE TO LAW
In connection with this charge, the Commission finds as a fact that specifications (a), (b) and (c) insofar as same refer to
Rule 2, Moral Conduct, Section 1, Adherence to Law, and Rule 4, Performance of Duty, Section 4, Neglect of Duty,
have been proven by the Appointing Authority, and that the Appellant did violate these Rules.
It is clear that Saacks operated the "Police Security Details, Inc." without an occupational license and without permission from the Police Department, and without a doubt, profited from the operation of the business. If Lt. L.J. Canal (too ill to be called as a witness) was in charge of the business on a day to day basis, it was Saacks' responsibility to properly exercise command supervision over this lower ranking officer, and he cannot simply excuse any wrongdoing by saying that it was Canal's responsibility.

II. PUBLIC STATEMENTS AND APPEARANCES
With respect to this charge, the Commission finds as a fact that Saacks did voluntarily appear on television and made public appearances on Angela and Calling Ed Clancy, and did so without the consent of the Public Affairs Division of the Department or the Superintendent. This is a clear violation of Rule 6, Section 3, and in no way can be condoned or brushed aside by self-serving statements to the effect that it was done merely in defense. This "going public" by this officer could only cause confusion in the rank and file and be deleterious to the morale of the force, which should be represented by one voice. These public appearances could have been easily refused, and request for remarks could as well have been answered with the usual "no comment" which is the time-honored method employed in keeping matters from escalating and defusing otherwise explosive situations. Saacks chose to take another course, and in doing so, seriously violated the Department's Rule.

III. USE OF DEPARTMENT PROPERTY
Here perhaps is the most serious charge.
The Commission finds as a fact that Saacks did use an office in the Department for the purpose of carrying on his personal affairs concerning United Gaming, Inc., and Police Security Details, Inc. He did make use of office and cellular phones to further his private business interest, and never once thought it proper not to do so or tender repayment. If this was being done as a general rule in the Department, than one only can say it reflects very poorly on the Police Department, but it cannot be said to sanction this type of behavior. One might ask, and correctly so, just who did the appellant *464 really protect and serve? Was it his own private affairs that took precedence over departmental duties and responsibilities? It certainly seems that way. The various apologia preferred by Saacks is at all times throughout self-serving. This was a Deputy Superintendent of Police, not a Police Officer new to the beat. What an example to set for subordinates to emulate! Furthermore, not only were telephones used for private affairs, but also fax machines, computers and departmental addresses were listed on the various corporations' letterheads and checks. One might well ask again, just by whom was the Appellant employed? Then there are the charges to the movie company. Were the barricades, vans, police cars, and motor scooters really being used free of charge? If so, why do the billings show charges not only for the officers who drove the cars or vans, but there are itemized charges for the "van" and for the "barricades". Does this constitute only an error in billing, or is it a charge for the use of City equipment which City policy makes available free of charge? Saacks' corporation got paid in any event and the invoices seem to bear this out. (See exhibit 12). These are very serious charges and the Commission finds that there is a violation of Rule 7, Section 1, Use of Department Property.

IV. ASSOCIATIONS
The majority of the Commission is unable to find any violations regarding allegations concerning ownership vel non of "Jimmy C's Sports Bar", the appellant's participation in the movie "JFK" or in his alleged association with convicted felon, Frank Caracci. However, his receipt of a large sum of money, $325,000, raises questions again concerning for whom was the appellant actually working? This has to, and the Commission so finds, constituted outside employment on a very large scale indeed and violated ASOP 85.0 relative to outside employment.
It is very difficult for this Commission to conclude, as perforce it must, that from the totality of the offenses the appellant did not violate the above Rules and Regulations.

LEGAL PRECEPTS
The remaining issue is to determine if the suspension and termination constitute substantial cause as required by law. Cittadino vs Department of Police, 558 So2d 1311 (Ct. App. 4 Cir.1990). Substantial cause is a legal cause, and same is said to exist whenever the employee's conduct impairs the efficiency of the public service in which the employee is engaged. See also. Montgomery vs Department of Streets, 593 So2d 1352, 1355, Newkirk vs Sewerage and Water Board, 485 So2d 626, 627-628, (Ct.App.4th Cir.1986), writ denied, 489 So2d 920 (1986). "The burden of proof is less in a Civil Service Commission hearing than in a criminal proceeding." Cittadino, supra citing Lombas vs Department of Police, 467 So2d 1273 (Ct.App. 4th Cir. 1985).
The Commission concludes that the appointing authority did carry its burden of proof as set out in Lombas. The record discloses an employee of long service, and one who is both intelligent and extremely articulate. Certainly he has to be aware of just what it was he was about. He had to understand that his actions had a substantial relationship to the efficient operation of the public service and reflected on the Department in a manner completely out of harmony with his position as a Deputy Superintendent of Police. The higher one rises in rank and position, the more careful scrutiny with which one must view his various actions. To "earn" such a substantial sum of money from a business whose only business is gambling, and for that to be known throughout the Department, and to be condoned, is in effect to give license to every police officer on the Department to the same, albeit perhaps on a smaller scale. An officer of Saacks' rank knew, or should have known, that he was like Caesar's wife and above suspicion. The average police officer, the average citizen in the community when apprised of such transactions, has to be thinking other than thoughts of righteousness.
The Appellant has failed to conform to the high standard of behavior expected of a Police Captain, (not to mention a Deputy Superintendent of Police), and his conduct on the whole is highly prejudicial and unbecoming of *465 one who is sworn to protect and serve the best interests of the public.
The Appeal of the suspension and subsequent termination is DENIED, RENDERED AT NEW ORLEANS, LOUISIANA, THIS THE 19th of July, 1995.
 CIVIL SERVICE COMMISSION
 CITY OF NEW ORLEANS
 /s/ [Signature]
 /s/ [Signature]
 /s/ [Signature]

PER CURIAM
Upon consideration of appellant's application for reconsideration of this Court's denial of the application for rehearing in this matter, we find our original opinion which amends the decision of the Civil Service Commission to provide that appellant be involuntarily retired from the effective date of November 23, 1993 incorrectly increases appellant's penalty. As the City of New Orleans did not appeal from the decision of the Civil Service Commission, we are without authority to increase the penalty. Accordingly, we amend our original opinion to provide that the penalty of termination which was upheld by the Civil Service Commission is reduced to that of involuntary retirement effective April 19, 1994. In all other respects, the application for reconsideration is denied.
NOTES
[1] In August, 1993, Arnesta Taylor retired from the police department, and Deputy Chief Joseph Orticke, Jr. was appointed to the Superintendent's position.
[2] Where the testimony is taken by a referee or hearing officer, the Commission has no advantage over the reviewing court in evaluating the credibility of the witnesses as does the usual trier of fact and under such circumstances, the reviewing court need not defer to the Commission's determination of the credibility issue. Tobias v. Department of Streets, 454 So.2d 835 (La.App. 4 Cir.1984).
[3] The reason given for the urgency to search was that it was the day before Thanksgiving and OMI and the city attorney feared the records would be lost or removed over the long holiday weekend.
[4] The charge of Theft as a violation of the Adherence to Law section relates to the charge of use of department property and will be addressed in conjunction with that charge.
[5] Nevertheless, the record shows that Saacks' city-owned telephone received a credit from Bell South Mobility in the amount of $1,050.00 for referrals Saacks had made to other customers. Saacks contends that he could have directed this credit to be placed on his personal cellular phone, but that he placed it on the city phone to cover reimbursement for personal use of that phone.
[6] Although Saacks was also charged with failure to obtain authorization for his ownership of "Jimmy C's Sports Bar" and his part in the movie "JFK", the Commission did not affirm these charges and this decision was not appealed by the Appointing Authority. We will therefore not address these charges.
[7] As will be discussed in the section regarding the misuse of departmental property, the record fails to support the Appointing Authority's charge that Canal's activities in managing this business violated departmental rules.