ALTON JONES       *       NO. 2022-CA-0121

VERSUS       *

DEPARTMENT OF PUBLIC       *       COURT OF APPEAL
WORKS
      FOURTH CIRCUIT

      *

      STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CITY CIVIL SERVICE COMMISSION ORLEANS
NO. 9160 & 9161
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Dale N. Atkins, Judge Pro
Tempore James F. McKay, III)

Brett J. Prendergast
4603 South Carrollton Avenue
New Orleans, LA 70119

      COUNSEL FOR PLAINTIFF/APPELLEE, Alton Jones

William R. H. Goforth, Assistant City Attorney
Elizabeth Robins, Deputy City Attorney
Churita H. Hansell, Chief Deputy City Attorney
Kevin C. Hill, City of New Orleans Attorney
Donesia D. Turner, City Attorney
1300 Perdido Street, Room 5E03
New Orleans, LA 70112

      COUNSEL FOR DEFENDANT/APPELLANT, Department of Public
Works

**AFFIRMED
OCTOBER 31, 2022**

DNA

TFL

JFM

This is a civil service disciplinary matter. Appellant, the Department of Public Works for the City of New Orleans ("DPW"), seeks review of the January 13, 2022 decision of the New Orleans Civil Service Commission (CSC), which reversed DPW's disciplinary action against Appellee, Alton Jones ("Mr. Jones"). For the following reasons, we affirm the decision.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*THE ALMONASTER AUTO POUND FACILITY*

DPW's Parking Division, Towing Section oversees the Almonaster Auto Pound Facility ("Almonaster Facility"), which functions as long-term storage of impounded vehicles. If the impounded vehicles at the facility remain unclaimed by their owners, the City of New Orleans ("City") eventually obtains title to the vehicles and sells them at auction through a third party. In order to obtain the title, however, DPW must first determine the Vehicle Identification Number ("VIN") for each vehicle. When a tow truck driver first brings a vehicle to the Almonaster Facility, the lot attendant prepares a "jacket" that lists not only the VIN but also the make, model, color, license plate number, and condition of the vehicle. If the vehicle's VIN is not visible, the tow truck driver is responsible for unlocking the

1

vehicle. The jacket is then given a number that is placed on the vehicle so that it can be located later, either when retrieved by the owner or when the City seeks the title after the owner fails to claim it.

### THE MAY 23, 2019 SUBJECT INCIDENT

On the date of the subject incident, May 23, 2019, Mr. Jones served as the Parking Section Supervisor at the Almonaster Facility, in which capacity he managed the day-to-day operations and supervised other employees, as well as the tow truck drivers assigned to the facility. That day, one of the tow truck drivers, Erica Cox ("Ms. Cox") towed to the facility a 2006 Suzuki Aeiro hatchback ("Suzuki"), which had been reported as an abandoned vehicle. It had no motor or door handles and had broken latches on the doors. Additionally, the vehicle's back windshield was missing and had been replaced with a piece of Plexiglass that had been attached with sheet-metal screws and caulking. The Plexiglass had a small crack. Ms. Cox advised Mr. Jones that she was unable to record the VIN because a piece of paper on the dashboard obscured part of it. She also informed him that she tried to open the Suzuki's doors with an unlocking tool but was unable to do so because of the condition of the doors.

Mr. Jones and the lot attendant, Shavonne Jenkins ("Ms. Jenkins"), also tried to open the Suzuki with the unlocking tool but were unable to do so. Noticing that the back windshield had been replaced with the sheet of Plexiglass, Mr. Jones unscrewed the Plexiglass in an attempt to get inside and to unlock a door. Eventually, a piece of the Plexiglass broke off, and Mr. Jones was able to reach his hand inside to try to find the latch to open the door but was unable to find it. He continued working on the Plexiglass, and it ultimately broke. Thereafter, Ms. Jenkins entered the vehicle through the back and opened the doors. Unbeknownst

2

to Mr. Jones, Ms. Cox videotaped this incident. The City later obtained title to the vehicle and sold it at auction for $250.

### REPORTING AND INVESTIGATION OF THE MAY 23, 2019 INCIDENT

Subsequently, Ms. Cox, Enrico Sterling ("Mr. Sterling"), who was Mr. Jones' immediate supervisor, and Tamara Sylvain, who was the human resources manager for DPW, contacted the Office of Inspector General ("OIG") concerning the May 23, 2019 incident. Terrance Barrett ("Mr. Barrett"), an investigator for OIG, took photos of the Suzuki in September 2019 and interviewed Mr. Jones on September 18, 2019. At that time, Mr. Barrett asked Mr. Jones if he was aware of any incident in which an employee intentionally or accidentally damaged a vehicle at the Almonaster Facility while the vehicle was processed after being towed there, and Mr. Jones responded that he was not. Mr. Barrett did not show Mr. Jones photos of the Suzuki, nor did he ask Mr. Jones specifically about the May 23, 2019 incident.

Mr. Barrett and William Bonney ("Mr. Bonney") interviewed Ms. Jenkins on October 24, 2019, and asked her the same question; and she also replied that she knew of no such incident. Mr. Barrett then showed her photos taken from the video that Ms. Cox recorded, and Ms. Jenkins then remembered the incident. Even though Mr. Jones and Ms. Jenkins both responded that they knew of no incidents, Mr. Barrett thought that Ms. Jenkins initially claimed no knowledge because she feared retaliation from Mr. Jones. However, Ms. Jenkins did not testify as to any such fears.

Mr. Barrett then prepared a report wherein he suggested that Mr. Jones committed three violations: (1) violation of New Orleans Parking Control Code of Conduct Section 14.1.15, failure to report accidents; (2) violation of Ordinance

3

024395, Section 2-1120, Chapter 20(a), failure to cooperate with the OIG in an investigation; and (3) neglect of duty in violation of CAO Policy Memorandum Number 83(R), Standards of Behavior for City Employees, Section II, General Standards, Paragraph (f).

*APRIL 7, 2020 NOTICE OF SUSPENSION*

After Mr. Barrett submitted his report, DPW notified Mr. Jones in an April 7, 2020 letter that he was "being placed on a thirty (30) day emergency suspension without pay effective Saturday, April 4, 2020[,] through May 3, 2020[,] for unprofessional conduct by intentionally damaging a vehicle at the City's abandoned vehicle lot and then refusing to cooperate in the investigation of this incident by the [OIG.]" DPW stated in the letter that it was taking this disciplinary action based on the findings of the OIG's report, which "confirm[ed] [Mr. Jones'] willful destruction of property and refusal to cooperate with their investigation."

*APRIL 28, 2020 NOTICE OF TERMINATION*

In a subsequent letter dated April 28, 2020, DPW notified Mr. Jones that "[e]ffective Thursday, April 23, 2020, [he was] demoted from Parking Enforcement Section Supervisor to Tow Truck Operator IV and terminated from [his] position of Tow Truck Operator IV on Friday, April 24, 2020." DPW found that Mr. Jones violated: (1) City of New Orleans Ordinance 024395, Section 2-1120, Chapter (20)(a) for failing to cooperate with the OIG; (2) the Public Works Staff Handbook Policies of Conduct and Reporting Accidents for failing to report the damage he caused to the Suzuki and failing to report the accident that caused it; (3) CAO Memorandum #83(R) Standards of Behavior for being untruthful and not forthcoming during the OIG investigation, failing to report the damage to the Suzuki, failing to direct a subordinate to accurately report the damage to the

4

Suzuki, using a power drill rather than the unlocking tools, and failing to seek approval from a supervisor before doing so; and (4) DPW's Parking Division Parking Control Section Standard Operating Procedures Section 14.1:15 for using a power drill rather than the unlocking tools, failing to seek approval from a supervisor before doing so, failing to report the damage to the Suzuki, and failing to direct a subordinate to accurately report the damage to the Suzuki. DPW demoted Mr. Jones as of April 23, 2020, and terminated his employment as of April 24, 2020. According to the record, Mr. Jones had worked for DPW for twenty-one years prior to his termination.

On May 5, 2020, Mr. Jones appealed this disciplinary action, and hearings were held on October 22, 2020, and May 10, 2021. The presiding hearing examiner was Alexandra Mora, Esq. ("Ms. Mora").

***OCTOBER 22, 2020 CSC HEARING***

At the October 22, 2020 hearing, Ms. Jenkins testified that on May 23, 2019, the date of the subject incident, she was assigned to the Almonaster Facility and that one of her duties was to complete impoundment forms "to keep records of the vehicles . . . in the lot" and to report their condition upon arrival. Regarding the Suzuki, Ms. Jenkins stated that she wrote on the form that the vehicle had a missing back windshield because that would be its status on the lot after Mr. Jones removed the Plexiglass. Further, Ms. Jenkins testified that when Mr. Barrett and Mr. Bonney interviewed her on October 24, 2019, about the subject incident, "at first, [she did not] know what they [were] talking about" but that they refreshed her memory about the subject incident with photographs.

At the same hearing, when Mr. Barrett was questioned about his recommendation in his report that Mr. Jones be charged with a violation of New

Orleans Parking Control Code of Conduct Section 14.1.15 (failure to report accidents), he agreed that it was possible that the provision did not apply to Mr. Jones because it was addressed to Parking Control Officers or Parking Control Officer Supervisors, neither of which positon Mr. Jones held. Mr. Barrett admitted that those positions dealt with parking violations and had nothing to do with impound lots. He also admitted that while a photo he took in September 2019 reflected there was no paper obscuring the VIN, he had no way of knowing if paper was there in May 2019 when the vehicle was towed to the lot.

Mr. Sterling testified at the October 22, 2019 hearing that he was Mr. Jones' direct supervisor. He described the operations at the Almonaster Facility and agreed that there were times when personnel needed to unlock a vehicle, including to get the VIN if it was not visible. He stated that the lot workers have tools to unlock vehicles, and he was not sure that other tools would damage a vehicle, but it was not standard procedure to use a drill to remove a window to get inside. Mr. Sterling further stated that Mr. Jones had the obligation to help Ms. Cox open the vehicle but that if Mr. Jones could not unlock it, Mr. Jones should have called him, his direct supervisor, to determine what to do. Mr. Sterling testified that, thereafter, he would have contacted the director to get authorization to enter or possibly get a lock expert to open the vehicle. Mr. Sterling noted that Mr. Jones should have filled out a damage report, or ensured that one was made, which would then be forwarded to Risk Management.

**MAY 10, 2021 CSC HEARING**

Marcello Barbaro ("Mr. Barbaro"), the Deputy Director of DPW, testified at the May 10, 2021 hearing that he oversaw all administrative functions within the department and was the chief personnel officer for all discipline and personnel

6

issues. Mr. Barbaro stated that he reviewed the report from the OIG and its attached videos and statements. Further, Mr. Barbaro testified that he was particularly concerned that Mr. Jones was a supervisor who should set an example for other employees, and he thus issued an emergency suspension of Mr. Jones. When asked about the specific provisions included in the April 28, 2020 termination letter, Mr. Barbaro agreed that the language used in the OIG recommendation did not track the provisions of New Orleans Parking Control Code of Conduct Section 14.1.15, but he first noted that this language was not in the disciplinary letter. When shown that it was, he stated that the decision to terminate Mr. Jones was not based on that provision "because a lot of us felt (the provision) was based on somebody getting into an accident, a vehicle accident, not breaking a back window." Instead, Mr. Barbaro testified, he relied on a different provision, Section 14.0, conduct unbecoming of an employee of DPW or tending to bring disrepute to DPW. He stated that for civil service purposes, Mr. Jones is part of the parking department but administratively falls under towing. With respect to the finding that Mr. Jones did not cooperate with the OIG investigation, Mr. Barbaro stated that it seemed to him that Mr. Jones was uncooperative and that this lack of cooperation was very important in his determination to terminate Mr. Jones.

Testifying on behalf of Mr. Jones, Zepporiah Edmonds ("Ms. Edmonds") stated that she was the Parking Administrator for DPW. Ms. Edmonds described the various units included in the Parking Division and explained that the Almonaster Facility fell under the Towing Unit. She stated that she revised the Standards of Operation and Code of Conduct for DPW. Ms. Edmonds also explained that she viewed the videos of the May 23, 2019 incident and reviewed

7

the April 28, 2020 termination letter. She stated that the Suzuki was towed as a result of a 311 call reporting it as an abandoned vehicle, and she identified a work order that included a report from an inspection of the vehicle before it was towed. This report indicated the vehicle had no motor, and it listed an incomplete VIN. Ms. Edmonds also identified the impound form prepared by Ms. Cox, which included the complete VIN and the notation that the back windshield was missing. She stated that a complete VIN was necessary to get title to the vehicle, and information on a temporary tag was not acceptable. Ms. Edmonds further stated that the Suzuki eventually sold for $250. She disagreed that Mr. Jones should have gotten permission to remove the Plexiglass from the vehicle, noting that as manager of the Towing Unit, he was the decision-maker. Instead, she contended that he had the latitude and authority to make decisions given his level of authority. Ms. Edmonds stated that after viewing the videos, she saw nothing to show that Mr. Jones intentionally broke the Plexiglass.

### AUGUST 3, 2021 HEARING EXAMINER REPORT

Following the hearings, on August 3, 2021, Ms. Mora, the hearing examiner ("hearing examiner"), issued her report, wherein she delineated that DPW had to prove three elements by a preponderance of the evidence, namely that the misconduct alleged in the disciplinary notice occurred; that the misconduct had an adverse impact on the efficient operations of DPW; and that the discipline matched the severity of the misconduct. Regarding the first element, the hearing examiner found the evidence to be "overwhelming" that Mr. Jones removed the piece of Plexiglass to gain entry into the vehicle to obtain the VIN; however, she also stated "that there was arguably no damage to the vehicle . . . ." Moreover, the hearing examiner explained that because there were "no clear rules about reporting

8

[damage]," Mr. Jones had not violated any reporting requirement. Further, the hearing examiner found that "the failure to cooperate charge [wa]s simply unsupportable, given the length of time, the alleged 'damage' and the fact that a co-worker had the same response [about the incident]."

Turning to the second element, the hearing examiner reasoned that "[i]f [DPW] had proven the misconduct, it would certainly interfere with the efficient operation of the department since impeding investigations and damaging vehicles without reporting the damage would both slow down operations, erode public integrity, and cost the department money."

Concerning the third element, the hearing examiner noted that "[e]ven if there were any misconduct" on Mr. Jones' part, "the discipline [was] too serious for the offense."

In sum, the hearing examiner concluded that DPW met the second element, i.e. that the alleged misconduct would impair DPW's efficient operation; however, she concluded that DPW had not proven by a preponderance of the evidence both the first element (that Mr. Jones' behavior constituted misconduct) and the third element (that the discipline matched the offense).

### JANUARY 13, 2022 CSC DECISION[1]

Thereafter, the matter proceeded before the CSC. In its January 13, 2022 decision, the CSC concluded that DPW had not met its burden of proof in levying the subject disciplinary action against Mr. Jones. In particular, the CSC stated that DPW had failed to demonstrate "the occurrence of the complained of activity and the impairment of the efficiency of [DPW]."

---

[1] According to the record, the CSC initially issued a decision on January 4, 2022, but then rendered an amended decision on January 13, 2022. Therefore, this Opinion will summarize only the January 13, 2022 amended decision.

9

First, the CSC found that "[Mr.] Jones' failure to recall removing a makeshift [P]lexiglass windshield on a vehicle without a motor or door latches four months after the event [did] not reflect a failure to cooperate with the OIG." Instead, as the CSC noted, Mr. Jones met with the OIG and answered questions from the investigators.

Second, the CSC found that DPW had not demonstrated that Mr. Jones violated any DPW Standard Operating Procedure. Stating that "[t]he evidence was confusing, at best, about the policies of the Towing Division of [DPW] pertaining to damage to vehicles[,]" the CSC noted that the "version of the policy in the termination letter references willful damage to property." As the CSC explained, "[t]he Parking Administrator testified that no form exists to report damage at the impound lot . . . ." Additionally, as relayed in the CSC decision, "the Parking Administrator testified that it is not unusual for a vehicle to be damaged as part of the impoundment procedure." The CSC also noted that it "credit[ed] [Mr.] Jones' testimony, corroborated by [Ms.] Jenkins and the Parking Administrator, that a City employee (usually the tow truck driver) must obtain a full VIN in order for the City to obtain title to the vehicle and have it auctioned." The CSC further found that "[Mr.] Jones' testimony that the VIN was obscured by paper is corroborated by the incomplete VIN on the intake form" and "determined that [Mr.] Jones removed the [P]lexiglass to obtain the VIN and did not intentionally damage any property."

Third, the CSC found that DPW did not prove that Mr. Jones neglected his duty under CAO Memorandum 83(R), noting that "[Mr.] Jones was gaining entry to the vehicle to obtain the complete VIN, a part of his subordinate's job duties for which she had requested his assistance." Additionally, the CSC noted that "[t]he

10

Parking Administrator testified that [Mr.] Jones was the manager at the Almonaster Facility, and that he should not have been required to obtain the approval of a supervisor before removing the [P]lexiglass."

Fourth, the CSC determined that DPW "failed to show how Jones' removal of the [P]lexiglass impaired the efficient operation of DPW." In particular, the CSC observed that due to Mr. Jones having obtained the VIN, the City had the information it needed to gain title to the vehicle and to have a contractor auction it. Moreover, the CSC explained that no citizen complained about damage to the vehicle. The CSC concluded that Mr. Jones had not intentionally damaged the vehicle; rather, "[he] performed his job duties, and in the course of those duties, may have accidently damaged a non-original part of a junk vehicle."

Ultimately, the CSC granted Mr. Jones' appeal: it ordered DPW to reinstate him in his position as Parking Enforcement Section Supervisor and to reimburse to him all back wages and emoluments of employment from April 4, 2020, to the date of the CSC decision, January 13, 2022. DPW's appeal of the CSC decision timely follows.

## ASSIGNMENTS OF ERROR

On appeal, DPW asserts three assignments of error:

1. The [CSC] committed clear error by finding that DPW failed to establish, by a preponderance of the evidence, that [Mr.] Jones committed the conduct for which he was disciplined including: damaging a citizen's vehicle through the unauthorized use of a power drill to remove the vehicle's rear windshield, directing a subordinate to falsify DPW's impound lot form by stating that the rear window was missing when the car arrived at the lot, and failing to cooperate with the New Orleans Office of Inspector General (OIG) by denying that he ever damaged a citizen's vehicle during the course of his work.

2. The [CSC] erred in failing to find that [Mr.] Jones' conduct impaired the efficient operation of DPW because [Mr.] Jones did not violate any particular City or DPW policy.

11

3. The [CSC] erroneously reversed the discipline imposed by DPW, which was clearly warranted in light of [Mr.] Jones' extremely poor judgment in the exercise of his duties, reckless disregard for the condition of citizen-owned vehicle in DPW custody, abuse of his supervisory status to cover up his misconduct, and attempt to evade scrutiny by the OIG.

We turn to our discussion of the merits.

## DISCUSSION

### *I. PRINCIPLES APPLICABLE TO CITY CIVIL SERVICE MATTERS*

As noted previously, Mr. Jones was terminated from his position with DPW after having worked for DPW for twenty-one years. Regarding disciplinary actions in city civil service, La. Const. art. X, §8(A) (1974) states, in part, that "[n]o person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing." Neither DPW nor Mr. Jones disputes his permanent status in the City's service. This Court has interpreted that provision as meaning that "[a]n employee with permanent status in the classified city service may only be terminated, or otherwise subjected to disciplinary action, in writing and for good cause." *Bell v. Dep't of Police*, 2016-0677, p. 5 (La. App. 4 Cir. 3/22/17), 216 So.3d 819, 822 (citing La. Const. art. X, § 8(A); *Walters v. Dep't. of Police of New Orleans*, 454 So.2d 106, 113 (La. 1984)). "[C]onduct prejudicial to the public service involved or detrimental to its efficient operation" constitutes "good cause" for the dismissal of an employee. *Id.*

Louisiana Constitution Article X, Section 8(A) further provides that "[a] classified employee subjected to such disciplinary action shall have the right of appeal to the appropriate commission pursuant to Section 12 of this Part. The burden of proof on appeal, as to the facts, shall be on the appointing authority." Therefore, if an employee has been subjected to disciplinary action, he or she can

appeal to the CSC. In such an appeal, the appointing authority bears the burden of proof. *Bell*, 2016-0677, p. 5, 216 So.3d at 822. *See also* La. Const. art. 10, §8(A) (1974). Specifically, the appointing authority must prove "by a preponderance of the evidence[] that the complained-of activity or dereliction occurred, and that such dereliction bore a real and substantial relationship to the efficient operation of the appointing authority." *Bell*, 2016-0677, p. 5, 216 So.3d at 823 (citing *Cittadino v. Department of Police*, 558 So.2d 1311, 1315 (La. App. 4 Cir.1990)). Thereafter, the CSC's "duty [is] to decide independently from the facts presented whether the appointing authority has good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the dereliction [or the complained-of activity]." *Saacks v. City of New Orleans*, 1995-2074, p. 12 (La. App. 4 Cir. 11/27/96), 687 So.2d 432, 440.

This Court has stated that termination constitutes "the most extreme form of disciplinary action that can be taken against a classified or city employee." *Hardy v. Juvenile Justice Intervention Ctr.*, 2022-0030, p. 15 (La. App. 4 Cir. 6/16/22), 343 So.3d 288, 298 (citing *Honoré v. Dep't of Pub. Works*, 2014-0986, p. 16 (La. App. 4 Cir. 10/29/15), 178 So.3d 1120, 1131). Therefore, "[w]hen determining whether there is cause sufficient to terminate the employee when cause is required to do so, courts and commissions generally consider [multiple] factors including the seriousness of the offense, the employee's job level, past performance, and length of service, and the effectiveness of alternative sanctions to deter future similar conduct." *Id.* (quoting Rick J. Norman, LA. PRAC. EMPLOYMENT LAW § 12:9.12).

## II. STANDARD OF REVIEW

Louisiana Constitution Article 10, Section 12(B) (1974) provides that "[t]he decision of a commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located, upon application filed with the commission within thirty calendar days after its decision becomes final." In interpreting that provision, this Court has explained that an appellate court reviewing a CSC decision employs a mixed standard of review. *Morrison v. New Orleans Police Dep't*, 2022-0051, p. 7 (La. App. 4 Cir. 7/13/22), 344 So.3d 259, 265 (citing *Pitre v. Dep't of Fire*, 2021-0632, p. 7 (La. App. 4 Cir. 4/20/22), 338 So.3d 70, 75). That is, the CSC's factual findings are afforded deference and should not be disturbed unless they are manifestly erroneous or clearly wrong. *McGaw v. New Orleans Police Dep't*, 2020-0564, p. 6 (La. App. 4 Cir. 6/9/21), 323 So.3d 901, 906 (quoting *Regis v. Dep't of Police*, 2012-1043, p. 5 (La. App. 4 Cir. 12/12/12), 107 So.3d 790, 793). When reviewing the CSC's determination whether the disciplinary action was based both on legal cause and commensurate with the infraction, an appellate court should not modify the decision unless it is arbitrary or capricious (meaning there is no rational basis for the action) or constitutes an abuse of discretion. *Id.*

## III. ANALYSIS

With these principles in mind, we consider whether the CSC's determination that DPW failed to meet its burden of proof was arbitrary, capricious, or characterized by an abuse of discretion.

***Alleged Violation of City of New Orleans Ordinance 024395, Section 2-1120 Chapter (20)***

In its termination letter to Mr. Jones, DPW alleged that Mr. Jones violated City of New Orleans Ordinance 024395, Section 2-1120 Chapter (20) and quoted that ordinance as follows:

> (a) It shall be the duty of every city officer, employee, to cooperate with the Office of Inspector General in any investigation . . . .
>
> . . . .
>
> (d) Any employee who violates any provision of this chapter shall be subject to discharge or such other discipline as may be specified . . . .

DPW asserted that Mr. Jones was "untruthful and not forthcoming" during the OIG investigation. However, the CSC found that Mr. Jones' inability to recall an incident from four months prior did not render him "untruthful and not forthcoming." Ms. Jenkins was also unable to recall the incident until she was shown photos of the vehicle, but the OIG did not consider her response to be "untruthful or not forthcoming" and did not recommend that she be disciplined. Mr. Jones was not given the opportunity to refresh his memory with the photos; and, as the CSC noted, he answered the general questions put to him by the investigator and cooperated. Thus, the CSC concluded that DPW failed to prove Mr. Jones violated this ordinance. We agree with the CSC's determination.

***Alleged Violations of DPW's Staff Handbook***

DPW also alleged that during the May 23, 2019 incident Mr. Jones violated DPW's Staff Handbook:

<u>Conduct:</u>

*"Employees should perform their work and conduct themselves in such a manner that reflects professionalism, is respectful toward*

*others, and brings credit to the City. Poor performance or misconduct of any kind will result in appropriate disciplinary or corrective action. In addition, employees are prohibited from engaging in conduct listed below and may be disciplined, up to and including dismissal[."]*

- *. . . willfully damaging or destroying property in any way.*

Reporting Accidents or Injuries[:]

*"All on-the-job injuries and accidents, regardless of their severity, must be reported immediately to the employee's supervisor. An accident is defined as any occurrence which produces damage to property or material[."]*

With respect to DPW's allegation that Mr. Jones violated the Department's Staff Handbook provisions for reporting the damage to the Suzuki, Ms. Edmonds, the Parking Administrator for the Department, testified that the only form covering damage to a vehicle was one to be filled out by the owner when retrieving the vehicle. DPW presented no evidence to the contrary. Additionally, DPW failed to demonstrate that Mr. Jones willfully damaged the Suzuki. Instead, the record indicates that Mr. Jones attempted to carefully remove the already cracked Plexiglass in order to aid Ms. Cox and Ms. Jenkins in obtaining the vehicle's VIN, an action which ultimately allowed the City to sell the Suzuki for $250. Essentially, as the CSC determined, Mr. Jones accidentally broke the Plexiglass while trying to perform his job duties. Moreover, Mr. Jones removed a piece of Plexiglass rather than the back windshield itself: thus, Mr. Jones' action did not change the fact that the Suzuki was missing a windshield. In light of the foregoing, the CSC found that DPW failed to prove that Mr. Jones intentionally damaged the Suzuki and that Mr. Jones violated any provisions of the Staff Handbook as alleged in the termination letter. We find that the CSC did not commit reversible error in so concluding.

***Alleged Violation of the Standard Operating Procedures of DPW's Towing Unit***

As for Mr. Jones' alleged violation of the Standard Operating Procedures of the towing unit of the Department, the termination letter stated that he violated Section 14.1:15, dealing with damage to property by an employee. When it was pointed out to Mr. Barbaro that the language quoted in the letter and in the OIG recommendation upon which it was based did not agree with the actual language in the section, he admitted that he did not base his decision to discipline Mr. Jones upon this section but instead relied upon Section 14.0. However, because that section was not charged in the termination letter, Mr. Jones had no notice of it, and it could not form the basis to discipline him. We agree with the CSC that DPW failed to prove that Mr. Jones violated the section alleged in the letter.

***Alleged CAO Memoranda Violations***

Lastly, DPW alleged that Mr. Jones violated two CAO Memoranda:

**CAO Memorandum #5 Vehicle & Equipment Policy**

XIII. Accidents

a. *"All incidents and/or accidents, regardless of severity, that results in property damage, must be reported[."]*

b. *"Employees involved in an accident must submit the Vehicle and Equipment Damage Report Form to their Departmental Vehicle Coordinator and their Supervisor. The Vehicle Coordinator then must email that form to emdaccidents@nola.gov within 24 hours[."]*

**CAO Memorandum #83(R) Standards of Behavior**

*II. General Standards*
*f. "Each employee, because of the job assignment, has certain required duties and must do that job. Failure to perform these duties or take these responsibilities is neglect of duty[."]*

*VI. Violations of Standards*

> *"Employee violations of a standard of behavior as set forth in this memorandum may subject the employee to disciplinary action and possible termination of employment*[*."*]

Essentially, DPW alleged that Mr. Jones exhibited neglect of duty and poor judgment by removing the Plexiglass on the Suzuki without first seeking permission of his supervisor; failing to report that he had damaged the vehicle; and failing to direct his subordinate to report the vehicle damage accurately. However, Ms. Edmonds testified that Mr. Jones had the authority to use a different means of entering the vehicle once the unlocking kit did not work. Additionally, Mr. Jones had the duty to help Ms. Cox and Ms. Jenkins to unlock the vehicle to obtain the VIN from the dashboard that was partially covered by a piece of paper. Ms. Edmonds also testified that discovering the VIN was necessary to obtaining the title to the vehicle so that it could be sold at auction if the owner failed to retrieve it. She further stated that the only form covering damage to a vehicle was one to be filled out by the owner when retrieving the vehicle. Considering the foregoing, we agree with the CSC's determination that DPW failed to prove these alleged CAO memoranda violations.

### Whether the Conduct Impaired the Efficiency of DPW

Finally, we also agree with the CSC that DPW failed to demonstrate that Mr. Jones' conduct impaired the efficiency of DPW. Mr. Barbaro testified that he was especially concerned about the effect of Mr. Jones' alleged actions, given that Mr. Jones was a supervisor, who was an example to his subordinates. As the CSC noted, "[Mr.] Jones obtained the VIN and the [Suzuki] (lacking a motor, locks, and handles) was sold. [He] obtained the information for the City to gain title to the vehicle and have a contractor auction it. No citizen complained of damage to the vehicle, and [Mr.] Jones did not intentionally damage the vehicle." Further, the

CSC explained that "[Mr.] Jones performed his job duties, and in the course of those duties, may have accidently damaged a non-original part of a junk vehicle." We agree with the CSC's determination: it is difficult to see how Mr. Jones' decision to remove an added-on piece of Plexiglass covering on the back of an abandoned vehicle in order to unlock the vehicle to obtain a needed VIN impaired the efficiency of DPW. Rather, as the CSC concluded, we find that this action enabled the City to obtain the VIN; ultimately secure the title to the vehicle; and sell it at auction.

We find that the CSC did not commit reversible error and that its ruling was not arbitrary, capricious, or an abuse of discretion because DPW failed to carry its burden of proving by a preponderance of the evidence that there was legal cause for the disciplinary action levied against Mr. Jones and that his actions impaired the efficiency of DPW.

## DECREE

For the foregoing reasons, we affirm the CSC's January 13, 2022 decision, which reversed DPW's disciplinary action against Mr. Jones by overturning his termination; reinstating him in his position; and ordering reimbursement of all back wages and emoluments of employment to him.

**AFFIRMED**